Judy M. Haney was convicted by a Talladega County jury of capital murder and was sentenced to death. The Court of Criminal Appeals ultimately affirmed the conviction. See Haneyv. State, 603 So.2d 368 (Ala.Crim.App. 1991). This Court granted Haney's petition for the writ of certiorari. Rule 39(c), A.R.App.P.
In her petition to this Court, Haney presents over 20 issues for review. She presented all but one of these issues to the Court of Criminal Appeals. That court issued a detailed and lengthy opinion, which provided a thorough treatment of each issue raised by Haney. We have thoroughly reviewed the record before us for error regarding the issues raised as well as for plain error not raised.[1] We find no error by the Court of Criminal Appeals in affirming the conviction and will not specifically address each of the issues raised by Haney in this Court. However, we address Haney's principal contention presented to this Court — that she was a "battered wife" or a victim of "spouse abuse" and that the consequence of that alleged abuse should preclude the imposition of the death penalty in this case.
Haney argues that she was a "battered wife." She contends that the murder of her husband was the culmination of a long family tragedy that began 15 years before, when, she says, her husband began abusing her. Haney acknowledges that the murder of her husband was a grossly inappropriate response, as well as a violation of the laws of Alabama. She recognizes that it deserves punishment, but argues that because of the alleged abuse, the death sentence is not appropriate. She contends that the trial court failed to consider the alleged abuse as a mitigating factor and, therefore, that her sentences are due to be reversed.
In support of her argument that she was a victim of an abusive husband, Haney testified at trial that her husband had beaten, kicked, and otherwise physically abused her and their children for numerous years, and that just before the murder he had been having an affair with her best friend. She also called Dr. Michael Holt, a psychologist, to testify on her behalf. Dr. Holt opined that Haney was suffering from a psychological defect, which he characterized as "spouse abuse syndrome." However, he also testified that she knew right from wrong and possessed the capacity to appreciate the criminality of her conduct and to conform her conduct to the requirements of the law.
In response to Haney's contention that she was suffering from "spousal abuse," the State called its own psychologist, Dr. Doug McKeown. Dr. McKeown agreed with Dr. Holt that Haney possessed the capacity to appreciate the criminality of her conduct. However, Dr. McKeown did not agree that Haney was suffering from a psychological defect known as "spouse *Page 414 
abuse syndrome." Dr. McKeown found that there was no evidence to suggest that Haney had such a defect, and he concluded that she was psychologically normal.
The concept of a "battered spouse" syndrome has won recognition in courts throughout the country. See Ex parteHill, 507 So.2d 558 (Ala. 1987); State v. Koss, 49 Ohio St.3d 213, 551 N.E.2d 970 (1990); State v. Hennum, 441 N.W.2d 793
(Minn. 1989); State v. Ciskie, 110 Wn.2d 263, 751 P.2d 1165
(1988); Commonwealth v. Rose, 725 S.W.2d 588 (Ky. 1987);State v. Hill, 287 S.C. 398, 339 S.E.2d 121 (1986); State v.Hodges, 239 Kan. 63, 716 P.2d 563 (1986); State v. Kelly,97 N.J. 178, 478 A.2d 364 (1984); Ibn-Tamas v. United States,455 A.2d 893 (D.C.App. 1983); Smith v. State, 247 Ga. 612,277 S.E.2d 678 (1981); State v. Anaya, 438 A.2d 892 (Me. 1981).
In Koss, the wife was indicted for the murder of her husband. At trial she presented witnesses who testified that her husband had beaten her on numerous occasions. Various witnesses testified to these alleged beatings, including a counselor at a "Witness and Victim Services Center." The wife took the stand at trial and recounted several instances when her husband had beaten her or had threatened to kill her. She testified that on one occasion he had tried to smother her with a pillow and that on another occasion he had put a radio in the bathtub while she was taking a bath. She stated that her husband had threatened to kill her children if she did not drop a domestic violence charge she had filed against him. On the night of the murder, the wife testified, the following happened:
 "[U]pon entering the bedroom, she saw a gun on the bedside table. She stated that this frightened her because she previously had never seen the gun out. She testified that she 'must have picked' up the gun, afraid that her husband was going to kill her. According to appellant, her husband then hit her. She could not remember anything from the time her husband hit her to the time when she heard a 'noise,' which she believed was gurgling blood. When asked upon cross-examination if she caused the death of Michael, purposely or not, appellant answered that she had 'no idea.' She testified that 'I purposely did not kill Michael Koss,' and '[i]f I killed him, it was an accident.' "
Koss, 49 Ohio St.3d at 214, 551 N.E.2d at 971.
The trial court denied the wife's motion to introduce evidence of the "battered wife syndrome." The jury found the wife not guilty of murder, but guilty of the lesser included offense of voluntary manslaughter and sentenced her to 8 to 25 years in prison. The Supreme Court of Ohio reversed, holding:
 "Expert testimony regarding the battered woman syndrome can be admitted to help the jury not only to understand the battered woman syndrome but also to determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger when considering the issue of self-defense.
 " 'Expert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any "common sense" conclusions by the jury that if the beatings were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs that the women are masochistic and enjoy the beatings and that they intentionally provoke their husbands into fits of rage. See Walker, The Battered Woman, 19-31 (1979).' "
Koss, 551 N.E.2d at 973 (quoting State v. Hodges, 239 Kan. 63,68-69, 716 P.2d 563, 567 (1986)).
In Hennum, the wife was convicted of second degree felony murder in the shooting death of her husband. There was evidence that throughout their marriage the husband behaved violently toward his wife and the children. The wife was once taken to a hospital with contusions and scratches on her face and a punctured lung caused by *Page 415 
a blow to her ribs inflicted by the husband. Another time, the husband attacked the wife by kicking her with steel-toed boots, causing a ruptured spleen, which required surgery to remove the spleen. The wife on another occasion entered the hospital after the husband hit her in the face with a beer bottle; she suffered a broken nose and severe lacerations on her face as a result of the blow. The husband was even arrested after another attack on the wife and in regard to that attack he pleaded guilty to assault.
In Hennum, the events leading up to the murder were as follows:
 "Upon his return [the husband] entered the trailer, slamming the door behind him. [The wife] was standing near the stove and [the husband] pushed her away, shouting, 'What's for supper, bitch?' [The husband] saw some oatmeal left over from breakfast sitting on the stove. He picked up the pan of oatmeal, hit [the wife] with it on the side of the head and dumped the oatmeal on top of her. [The child] was awakened by the fighting and saw [the husband] dump the oatmeal on [the wife].
 "[The husband] then grabbed [the wife] by the hair and began pulling her around the room showing her some cans of chili and telling her to warm some up for him. When she began to prepare the chili, he went after her again, throwing her to the floor and ripping her shirt. Whenever she fell he would grab her back up by the hair. At one point [the husband] had her pinned to the floor with his hands on her throat.
 "Eventually, [the husband] went into the living room and while [the wife] was attempting to cook dinner, he threw a piece of firewood at her. He then threw a car part at her. [The wife] tried to protect herself by hiding under the kitchen table. [The husband] grabbed a rocking chair and threw it at her, causing the chair to break."
Hennum, at 795-96.
The abuse continued until the husband went into the bedroom and fell asleep. The wife testified that after he went to sleep, she noticed a gun lying on the floor and saw a bullet sticking out of it. She stated that she loaded the bullet back into the gun and decided to scare her husband. She testified that "she went into the bedroom, closed her eyes, and fired the gun."
At trial the wife admitted killing her husband, but introduced evidence of "battered woman syndrome" as a defense. The Minnesota Supreme Court agreed that the trial court correctly allowed such evidence.
Alabama courts have also addressed the issue of spousal abuse. In Hill, the wife shot her common law husband three times in the head while he was sleeping. She was indicted for his murder, but contended that she was not guilty, because, she said, she was suffering from "battered spouse syndrome." The Alabama Court of Criminal Appeals affirmed the conviction of intentional murder, holding that the evidence of the battered spouse syndrome had been properly excluded. Judge Bowen concurred in the result reached by the majority. However, he dissented from that portion of the opinion implying that expert opinion testimony on the battered wife syndrome is per se inadmissible. Rather, he felt that "such an important issue as the one involved here should be decided only after thorough and exhaustive legal research based upon the particular facts involved." Hill v. State, 507 So.2d 554, 557 (Ala.Crim.App. 1987). This Court denied the writ, but agreed with Judge Bowen's opinion. Ex parte Hill, 507 So.2d 558 (Ala. 1987).
In the present case, Haney testified about alleged incidents of abuse throughout her marriage, as well as incidents of alleged abuse and neglect during her childhood. She testified that she grew up in a chaotic environment, with irresponsible alcoholics for parents. However, Haney's sister, Martha, contradicted Haney's testimony that she grew up in a violent home and had been abused by her parents.
Haney also testified that when she was 16 years old she married her husband, Jerry Haney. She testified that he was a volatile, demanding, and violent man, who slapped, knocked, and kicked his wife. She *Page 416 
testified that on one occasion, because the husband did not like the dinner she had prepared, he threw the food at her and "tore up the whole kitchen." She stated that on another occasion, he pushed her head through a plasterboard wall because she had said something he did not like.
She also testified that as their two children grew older, the husband began to abuse them too. She stated that he "was constantly slapping [T.] or pulling on her or jerking on her for the least little thing." She testified that on one occasion he threw T. over his shoulder and that her elbow broke when it slammed against a concrete slab covering an old wall. She also stated that the younger child made a mistake in carrying out his father's orders and was whipped with a rope.
Haney also testified that her husband was having an affair with a friend of hers. She stated that he would go over to the other woman's home early in the mornings and that when he returned home he would be abusive, aggressive, and threatening toward her and the children.
As noted above, Haney's sister contradicted her testimony concerning her childhood. Further, we point out that the findings of the psychologists who testified at trial raise doubts about Haney's testimony of abuse. Haney's own psychologist, as well as the psychologist for the state, was surprised by the test results that indicated how little Haney had been affected by the alleged abuse she described.
Concerning the events leading up to the murder, Haney testified that she had used money from their family savings account and stated that her husband told her he would kill her if she did not return the money. Haney stated that she decided to get herself and the children away from her husband and that she telephoned her sister Martha in Georgia and asked her to come and get her. Four days later, Martha came to Alabama and took Haney and the children back to Georgia to stay with her and her husband, Jerry Henderson. We note that there is testimony that Haney and her husband appeared to be on friendly terms and were even affectionate toward each other when Haney left with her sister.
Further testimony revealed the following: Shortly after arriving in Georgia, Haney told Martha and Jerry Henderson that she did not want to return home because she was afraid of what her husband might do when he discovered that money was missing from their savings account. She told the Hendersons that she would do anything if she could get rid of her husband. Thereafter, Haney and Jerry Henderson began discussing a plan whereby Haney would pay Jerry Henderson $3,000 in exchange for the murder of her husband (Jerry Haney). Henderson told Haney that he knew of someone who might be able to help. Later, he told Haney that everything had been arranged. Haney drew a map of the area around the Haney home in Talladega County, which showed Henderson where he could park his truck and not be seen. Further, Haney told Henderson that her husband had money in his wallet and to get it (the wallet) and the bank book.
On New Year's night, 1984, Henderson and his wife (Martha) were entertaining friends. Henderson complained of having the flu and retired to his bedroom. Once there, he turned out the light and let himself out the window. He then got into his pickup truck and drove to Alabama.
Following Haney's directions, Henderson parked his truck in a wooded area adjacent to the Haney home. Henderson then walked through the woods and up to the front door of the house. He put his loaded shotgun down on the porch and knocked on the door. Mr. Haney heard the knocking and went to the door. Henderson told Mr. Haney that he had brought Judy Haney and the children back to Alabama, but that the truck had run out of gasoline and they were sitting on the side of the road. Mr. Haney agreed to help Henderson get some gasoline.
When Mr. Haney stepped out of the house, Henderson shot him in the stomach with a shotgun. The blast knocked Mr. Haney to the ground and, while he was on the ground, Henderson shot him again, this *Page 417 
time grazing his ear. After this shot, Mr. Haney got to his feet and ran around to the back of his house, collapsing on the porch steps and begging for his life. Henderson placed the shotgun on Mr. Haney's bottom lip and fired the last shot.
On his return trip, Henderson stopped in Oxford, Alabama, and called his wife and Haney from a restaurant to tell them that Mr. Haney had been killed.
Henderson arrived home in Georgia around 3:30 a.m. He stated that he gave Haney the victim's wallet, which he had taken. Further, he stated that Haney took the insurance card, the Social Security card, the driver's license, and around $80.00 from the wallet and that she gave him $25 for gasoline and kept the rest. The remaining contents of the wallet were burned. The shotgun was thrown into a nearby river and was never recovered.
Saying that she was concerned that something had gone wrong, Haney contacted Lieutenant Billy Haney (Jerry Haney's brother), of the Talladega Police Department, the following day (January 2, 1984). Haney requested that Lieutenant Haney go check on her husband because, she said, she had been trying to call him, but had been unable to get an answer. Lieutenant Haney went to the residence, where he discovered his brother's body.
Jerry Haney's corpse was taken to the Department of Forensic Sciences for an autopsy. He had one shotgun wound to his left lower arm, which had penetrated the arm and entered his left chest. There was also a wound that had grazed the victim's left ear. Finally, there was one shotgun wound to Mr. Haney's mouth, which had caused the mouth to be torn at the corners. This wound fractured almost every bone in the victim's skull, fractured the first two cervical vertebrae, and drove a tooth into Mr. Haney's spinal cord. It was this gunshot wound to the mouth that killed Jerry Haney.
Haney paid Henderson $3,000 in three installments for killing her husband. Haney and the Hendersons agreed that they would say nothing about the killing and would stick to their story that they were all together at the Henderson residence in Georgia on the night of the murder.
The investigation of the victim's death continued for three years and eight months before an arrest was made. In fact, at one point during this time, Haney used her own daughter in an attempt to cast suspicion of the murder upon an innocent man. The record discloses a continuous pattern of lies told by Haney over this period of time and reveals a cold and calculating attitude toward the murder.
A break in the investigation came in the fall of 1987, when Martha Henderson agreed to cooperate with the state. The arrest of Haney and Jerry Henderson for the commission of the capital crimes followed shortly thereafter.
As noted above, Haney testified in her own behalf, and she admitted paying Henderson to kill her husband. She also admitted giving him instructions on how to approach her home without being observed, but denied drawing him a map. She denied telling him to get her husband's wallet and bank book, but she testified that she took her husband's Social Security card from his wallet and was given $20 from the wallet by Henderson.
The issue of the admissibility of evidence concerning the "spousal abuse syndrome" is not at issue here. Clearly, the trial court permitted such evidence into the record, and no one has argued that this was error. In fact, we note that the trial court's instructions to the jury concerning nonstatutory mitigating circumstances specifically allowed the jury to consider her testimony regarding abuse as a motive for the killing. The trial court instructed the jury as follows:
 "In addition to the mitigating circumstances previously specified, mitigating circumstances shall include any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for . . . his sentence of life imprisonment without parole instead of death, or her sentence [of] imprisonment without parole instead of death. Mitigating circumstances *Page 418 
however considered by you should be based upon the evidence that you have heard in this case."
Rather, as noted above, Haney's main thrust is that because of the alleged abuse, the death sentence imposed here is disproportionate to her crime.
The jury heard all the evidence and saw and heard the witnesses, including Haney. They listened as Haney's own sister contradicted Haney's stories of abuse at the hands of her parents. They listened as the psychologists' testimony raised doubts about Haney's testimony of abuse. They listened as the testimony revealed Haney's cold and calculating attitude toward the murder. Further, they heard the tape recordings and other evidence that outlined Haney's efforts to avoid detection for over three years. The jury also witnessed the relative size and physical condition of both Haney and her husband. Haney was apparently in good health, as was her husband prior to his death. It appeared that the husband was of average size and that Haney was 5'8" and weighed 175 pounds. After hearing all of the above evidence, the jury found that Haney was guilty of both capital offenses charged. In accordance with §§ 13A-5-43
through -46, a sentencing hearing was held before the jury, and the jury returned an advisory verdict recommending the death penalty. Ten jurors recommended the death penalty, and two recommended a sentence of life imprisonment without the possibility of parole. Clearly, the jury could have found that Haney's credibility had been undermined during the trial and that her allegations of abuse did not rise to such a level as to preclude the imposition of a sentence of death. Clearly, the credibility of the witnesses' testimony was for the jury to determine. Toranto v. McGraw, 293 Ala. 148, 300 So.2d 814
(1974).
The trial court then held another sentencing hearing, in accordance with §§ 13A-5-47 through -52, and, after weighing the aggravating and mitigating circumstances and considering the jury's recommendation, sentenced Haney to death. In coming to this conclusion, the trial court considered the existence or nonexistence of nonstatutory mitigating circumstances. These circumstances included Haney's character and record, the circumstances of the offenses, and other matters, as required by § 13A-5-52. Specifically, the trial court's findings, in pertinent part, are as follows:
 "The Court has made a diligent search under the provisions of Section 13A-5-52, the evidence offered by the defendant, and aspects of presentence report favorable to the defendant on mitigation to determine if there is any aspect of the defendant's character on record or any circumstance of the offenses for which she has been convicted that would constitute a mitigating circumstance and finds that the only mitigating circumstance, statutory or non-statutory, is the absence of a prior criminal record."
We further point out that this is not a case where the defendant killed her husband during an argument or when she felt that she was in eminent danger. Rather, Haney left her home, while apparently on good terms with her husband, and went to her sister's home in another state, where she was in no imminent danger of abuse from her husband. It was there, many miles away from her allegedly abusive husband, that she came up with the scheme to have him killed. Further, it was still several days before the killing actually took place.
We have thoroughly reviewed the record on appeal, as well as the well-written briefs filed by the parties. We find that Haney was afforded a full and unrestricted opportunity to present all mitigating evidence regarding her character and background, as well as any motivations behind the killing of her husband. The trial court considered all relevant statutory and nonstatutory mitigating evidence. Further, the jury was properly instructed to consider, as mitigating evidence, not only the statutory mitigating circumstances set out in the statute, but "any aspect of the defendant's character or record and any of the circumstances of the offense." The fact that the trial court did not specifically find that *Page 419 
Haney was suffering from "spouse abuse syndrome" does not mean that it did not consider the evidence of the alleged abuse. Rather, it indicates that the trial court considered the evidence but did not find it to be mitigating.
We have also examined the other issues raised by Haney and, as noted above, find that the Court of Criminal Appeals, in its opinion, adequately addressed each of her contentions except one. For the first time, on this certiorari review, Haney argues that her two capital convictions violate the constitutional proscription against double jeopardy because only one murder was committed.
Haney was charged with and convicted of two counts of capital murder: murder for hire, Ala. Code 1975, § 13A-5-40(a)(7), and murder during a robbery, Ala. Code 1975, § 13A-5-40(a)(2). Both of the counts were based on the same act, the intentional killing of her husband. However, because each crime contains an element not contained in the other, there was no violation of the prohibition against double jeopardy. Blockburger v. UnitedStates, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932);Jackson v. State, 516 So.2d 726 (Ala.Crim.App. 1985). See also Ex parte Henderson, 583 So.2d 305 (Ala. 1991) (murder during a robbery and murder done for pecuniary gain).
The judgment of the Court of Criminal Appeals is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES, ADAMS, HOUSTON, STEAGALL and KENNEDY, JJ., concur.[2]
[1] Our review of a death penalty case allows us to address any plain error or defect found in the proceeding under review. This is so even if the error was not brought to the attention of the trial court. Rule 45, A.R.App.P.
[2] Justice Houston did not attend oral argument, but he has listened to the tape recording of that argument.