The appellant, Barbara Bonner, appeals from her conviction for manslaughter, a violation of § 13A-6-3, Code of Alabama 1975. She was sentenced to 15 years' imprisonment. That sentence was split, and she was ordered to serve 2 years, followed by five years' probation.
The appellant contends that the trial court committed reversible error in refusing to allow her to introduce expert testimony concerning the "battered women syndrome." The trial court found that the relevance and materiality of the proffered testimony failed to outweigh its prejudicial effect on the jury.
"Battered spouse" syndrome has increasingly gained recognition in Alabama and in courts throughout the country. See Ex parte Haney, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925,113 S.Ct. 1297, 122 L.Ed. 2d 687 (1993), and the cases cited therein. See Sarah C. Madison, Comment, A Critique and Proposed Solution to the Adverse Examination Problem Raised by Battered Woman Syndrome Testimony in State v. Hennum, 74 Minn. L. Rev. 1023 (1990), for a list of jurisdictions that have considered battered spouse syndrome evidence. See also State v. Hickson, 630 So.2d 172, 175 (Fla. 1993), quoting Rogers v. State, 616 So.2d 1098 (Fla.Dist.Ct.App. 1993) (wherein the district court stated: "Because the scientific principles underlying expert testimony relative to the battered woman's syndrome are now firmly established and widely accepted in the psychological community, we conclude that the syndrome has now gained general acceptance in the relevant scientific community as a matter of law.") The New Jersey Supreme Court, for example, found an expert's testimony on the subject of battered spouse syndrome "essential to rebut the general misconceptions regarding battered women" because this testimony "is aimed at an area where the purported common knowledge of the jury may be very much mistaken, an area where jurors' logic, drawn from their own experience, may lead to a wholly incorrect conclusion, an area where expert knowledge would enable the jurors to disregard their prior conclusions as being common myths rather than common knowledge." State v. Kelley, 97 N.J. 178, 206, 478 A.2d 364, 378
(1984). The Alabama Supreme Court has reached the same conclusion in Ex parte Haney, 603 So.2d at 414:
 "`Expert testimony regarding the battered woman syndrome can be admitted to help the jury not only to understand the battered woman syndrome but also to determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger when considering the issue of self-defense.
 "`"Expert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any `common sense' conclusions by the jury that if the beatings were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered woman syndrome would be put to rest, including the beliefs that the women are masochistic and enjoy the beatings and that they intentionally provoke their husbands into fits of rage. See Walker, The Battered Woman, 19-31 (1979).'"
 "[State v.] Koss, [49 Ohio St.3d 213,] 551 N.E.2d [970 (1990)] at 973 (quoting State v. Hodges, 239 Kan. 63, 68-69, 716 P.2d 563, 567 (1986)."
In this case, the trial court engaged in a relatively extensive colloquy with defense counsel regarding the relevancy and materiality of the expert's proffered testimony. Defense counsel informed the trial court that the expert was a social worker who had a master's degree and who regularly counsels battered women. Defense *Page 441 
counsel further stated, in an offer of proof, that although the expert had never counseled the appellant, he was not offering the expert's testimony to show that the appellant suffered from any syndrome but rather to show the "psychological coping mechanisms of battered women and why they don't leave home and how they try to protect themselves." The trial court sustained the State's objection to the offer of proof because: (1) the proper factual predicate had not been laid to justify the testimony; and (2) the testimony would tend to confuse the jury because the homicide in this case occurred during a period of confrontation and the appellant was arguing self defense. In so ruling, the trial court stated, "I'm not going to allow [the testimony] until such time as the facts of the relationship are placed into evidence and we haven't had that yet." The trial court further found that "the confusion from allowing the proffered testimony into evidence outweighed the probative value of [the] testimony . . . in light of the facts of the case, which is a self-defense case, where the victim is alleged to [have been] actively beating on the defendant at the time he was stabbed."
After examining the record, we hold that the trial court erred in disallowing the appellant's offer of expert testimony. First, the record reveals that a proper factual predicate was established to justify the introduction of the expert testimony. Before the appellant's offer of proof, evidence was presented during the State's case-in-chief and by defense witnesses who testified that the appellant's husband, Curtis Bonner, subjected her and her children to mental and physical abuse before and during their marriage. During direct examination by the State, Officer Robert Jackson of the Frisco City Police Department testified that on several occasions he responded to "911" emergency calls made by the appellant as a result of physical beatings by the victim. Evidence was presented that the physical violence escalated during the couple's marriage. Defense witnesses, including the appellant's 10-year-old son and 9-year-old niece, testified that at least three times a month the victim would beat the appellant with his fists and push her into the wall. They also testified that the victim had fired a gun at the appellant and had beaten her with the gun barrel. Both children testified that there were times when the appellant fought back, and that she had, on two occasions, stabbed the victim. The appellant's son testified that on the night of the killing, the victim had been drinking and was beating the appellant. He testified that she "started blocking" his assault and then grabbed a knife and stabbed the victim. Evidence was presented that throughout their marriage the appellant requested the Department of Human Resources to provide legal aid to enable her to divorce the victim. However, the victim would apologize for his behavior and persuade her not to divorce him. The record indicates that the State countered the appellant's claim of self-defense by arguing that she continued in the allegedly abusive relationship with the victim, thereby creating an inference that she was not afraid of the victim.
However, generally, a battered woman "is or has been in an intimate relationship with a man who repeatedly subjects or subjected her to forceful physical and/or psychological abuse." Lenore Walker, The Battered Woman Syndrome 203 (1984).
 "The violence associated with this type of relationship is neither constant nor random. Instead, it follows a pattern. Dr. [Lenore] Walker identified a three-stage cycle of violence. The first stage is the `tension building' phase, during which small abusive episodes occur. These episodes gradually escalate over a period of time. The tension continues to build until the second stage — the acute battering phase — erupts. During this phase, in which most injuries occur, the battering is out of control. Psychological abuse in the form of threats of future harm is also prevalent. The third phase *Page 442 
is a calm, loving period during which the batterer is contrite, seeks forgiveness, and promises to refrain from future violence. This phase provides a positive reinforcement for the woman to continue the relationship in the hope that the violent behavior will not recur. The cycle than repeats itself.
". . . .
 "In sum, the battered woman feels `trapped in a deadly situation.' Caught in this cycle, she sometimes strikes back and kills."
Paul C. Giannelli and Edward J. Imwinkelreid, Scientific Evidence, § 9-3, pp. 268-73 (2d.ed. 1993).
The trial court erred in concluding that expert testimony on battered woman syndrome was unnecessary and that it would tend to confuse the jury in cases where the killing occurs during a confrontation, i.e., a situation where the killer might claim self-defense. In 1991, approximately 75% of cases using expert testimony on battered spouse syndrome involved situations where the killing occurred during a confrontation. See Holly Maguigan, Battered Women and Self-Defense: Myths and Misconceptions in Current Reform Proposals, 140 U. Pa. L. Rev. 379, 396-97 (1991).
 "The use of syndrome evidence generates substantial confusion regarding the jurisprudential bases for the defense. Specifically, many courts approach these claims as rooted in excuse theory — as opposed to justification — or create some hybrid of the two. However, self-defense claims are based entirely upon a theory of justification. Thus, someone who kills in self-defense is not morally culpable because society considers this act to be justified. Upon sober refection, society has concluded that this action was correct under the circumstances. The theory of battered woman syndrome adheres closely to this justification rationale; in fact, the syndrome so closely parallels the law of self-defense that its basic parameters appear to be controlled more by legal convenience than by psychological observation or theory.
 "When battered woman syndrome testimony is offered, many courts construe the defense as partly or wholly based upon principles of excuse. Indeed, some jurisdictions have placed syndrome testimony within such legal categories as diminished capacity or insanity. Even when courts interpret the theory as one grounded in justification, they invariably describe the defendant as `suffering' from the syndrome, as though it were a medical malady. This `mental disability' perspective has important ramification for the law as well as for battered women defendants.
 "Louisiana perhaps best illustrates the interpretation of the use of syndrome theory as an indication that the woman suffers from a psychological infirmity. For instance, in State v. Necaise, [466 So.2d 660
(La.Ct.App. 1985)] the defendant claimed self-defense in the shooting death of her husband. She was convicted of manslaughter and appealed, arguing that she should have been permitted to introduce expert testimony about the battered woman syndrome. Relying on precedent, the appellate court affirmed the conviction. The court expressed its reluctance to allow any evidence of the syndrome to be admitted in homicide prosecutions:
 "`We believe that allowing testimony which would attempt to prove the defendant a victim of "battered woman syndrome" and which would seek to establish her "state of mind" at the time of the shooting, absent a plea of "not guilty and not guilty by reason of insanity", [sic] would be, in effect, condoning the concept of "partial responsibility" — the allowing of proof of mental derangement short of insanity as evidence of lack of deliberate or premeditated design. The concept of partial of impaired responsibility has been rejected in this State in favor of *Page 443 
an "all or nothing" (i.e. sane or insane) approach.'
 "Clearly, in light of the theoretical underpinnings of the defense, the Louisiana courts have misunderstood the nature and purpose of the use of syndrome evidence. Proponents of the syndrome have always maintained that the basis for the defense is the reasonableness of the woman's actions given the circumstances of her life; the basis does not rest on any claimed psychological incapacity inflicted on the woman by these circumstances. For example, in Hawthorne v. State, [408 So.2d 801
(Fla.Dist.Ct.App. 1982)] the court specifically cautioned that expert testimony on the battered woman syndrome should not be categorized as an attempt to establish the defendant's diminished capacity and lack of responsibility for the shooting. Instead, such testimony `would be offered to show that because . . . [the defendant] suffered from the syndrome, it was reasonable for her to have remained in the home and . . . to have believed that her life and the lives of her children were in imminent danger.' Thus, this expert testimony spoke directly to the self-defense doctrine's requirement that the defendant `reasonably believed it was necessary to use deadly force to prevent imminent death or great bodily harm.'
". . . .
 "Similarly, People v. Rossakis, [605 N.Y. So.2d 825 (Supt.Ct. 1993)] offers a particularly illuminating example of courts' difficulty in grasping the jurisprudential basis for the defense and the concomitant dangers these misconceptions create for women employing the defense. In this murder case, the prosecution sought to preclude the defendant from offering battered woman syndrome expert testimony or, in the alternative, the state sought an order compelling the defendant to give notice of her intent to offer psychiatric or psychological evidence to support her claim of justification. The defendant planned to enter a claim of `justification' in response to the People's murder charges and contended that the introduction of the battered woman syndrome did not `give rise to . . . [a statutory] notice requirement and the . . . obligation of subjecting herself to psychiatric/psychological examination.'
 "The trial court held that expert testimony regarding the syndrome was admissible because it had `a substantial bearing on the defendant's state of mind at the time of the shooting and . . . is probative of the reasonableness of defendant's apprehension of danger at the time of the shooting.' However, the court also decided that such evidence fell within New York's statutory definition of `psychiatric evidence,' thus, requiring the defendant to provide written notice of her intent to present the evidence. The court asserted that the `defendant seeks to escape punishment for the shooting by reason of her claimed mental condition at the time of the commission of the acts charged.' Thus, the court declared that `fundamental fairness requires that notice pursuant to [state law] be served and [that] the People be permitted to conduct a psychiatric/psychological examination of her.'"
Faigman and Wright, The Battered Woman Syndrome in the Age of Science, 39 Ariz. L. Rev. 67, 88-91 (1997) (footnotes omitted).
Additionally, evidence that the appellant had actively fought with the victim and had stabbed him on previous occasions does not prevent her from being classified as a battered woman.
 "A somewhat more controversial application of the battered woman syndrome concerns its use to support the defendant's contention that her employment of deadly force was reasonable. Courts that allow the use of expert evidence to show reasonableness approach the question in one of two ways. First, some courts accept that the history of abuse and, in particular, the nature of that abuse, is pertinent to the reasonableness of the defendant's belief in *Page 444 
the need to use deadly force. alternatively, many courts appear to adopt a quasi-subjective reasonableness standard, by establishing the relevant comparison to be a reasonable battered woman rather than the ordinary reasonable person."
Faigman and Wright, supra at 87.
See Giannelli and Imwinkelreid, supra. Allowing the defense the opportunity to present expert testimony on the syndrome and the characteristics of a battered woman would not have confused the jury but instead would have given the jury and the trial court information beyond the understanding of the average layperson. Additionally, the introduction of expert testimony may have provided clarification on the issue of self-defense, i.e., whether the appellant acted reasonably under the circumstances.
Because the appellant laid a sufficient factual predicate to warrant introduction of the proffered expert testimony and because the expert testimony was relevant to the issue of self-defense, the judgment of the trial court is reversed and this cause remanded to that court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
All judges concur.