Leigh Ann Barrett was charged with attempted murder after she stabbed a neighbor, Ricky Cobb, with a kitchen knife. See §§13A-6-2, 13A-4-2, Ala. Code 1975. Following a jury trial, Barrett was convicted of assault in the second degree. § 13A-6-21, Ala. Code 1975. The trial court sentenced her to 10 years' imprisonment; that sentence was suspended and the trial court placed her on 5 years' supervised probation. The court also ordered Barrett to pay restitution, court costs, and $100 to the Alabama crime victims compensation fund. Finally, the court ordered Barrett to obtain mental-health counseling. This appeal follows.
The evidence tended to show that 41-year-old Barrett and 44-year-old Ricky *Page 944 
Cobb had been acquainted since childhood. On August 16, 2002, Barrett telephoned Cobb and asked him to bring her some vegetables from his garden. Cobb walked to Barrett's house with the vegetables. Cobb then walked a two-mile round-trip to a liquor store to purchase alcohol for him and Barrett. Cobb and Barrett went to a nearby house during the evening. The evidence about whether Barrett and/or Cobb were intoxicated was disputed, but there was no dispute that both parties consumed alcohol while they were together. A neighbor testified that Cobb and Barrett were "bickering back and forth for two hours straight." (R. 346.) She said that, at one point during the evening, Cobb called Barrett "a crazy bitch," and Barrett "got up and punched him in the face." (R. 346.) The neighbor further testified that Barrett, while referring to Cobb, told her that evening that if that "mother fucker ever messes" with her, she would kill him. (R. 347.)
Barrett and Cobb returned to Barrett's house after midnight. Cobb testified that Barrett was extremely intoxicated. In Barrett's statement to the police, she claimed that Cobb was intoxicated and that he attempted to rape her. Barrett also told police that Cobb lunged at her with a knife that he always carried on his person. Barrett took a kitchen knife from a drawer and stabbed Cobb in the upper abdomen. Barrett telephoned the police, and Cobb left her house and walked or stumbled home. Photographs presented at trial indicate that Barrett had a bloody wound on the back of her arm. Cobb was hospitalized; his stab wound required surgical repair.
 I.
Barrett first argues that the trial court erred when it disregarded undisputed expert testimony and found that Barrett does not suffer from battered woman syndrome ("BWS") and when it "disallowed any mention of BWS as an aspect of self-defense." (Appellant's brief at p. 8.) The State argues that the trial court did not abuse its discretion when it determined, based on evidence presented at a pretrial hearing, that the foundation for BWS had not been presented and that testimony about abuse Barrett suffered from men other than Cobb was irrelevant. We agree with the State.
The State filed a pretrial motion in limine alleging that, because Barrett had not entered a plea of not guilty by reason of mental disease or defect, she should be precluded from referring to any alleged diminished capacity or mental disease or to her subjective state of mind at the time of the crime. The court held extensive hearings on the motion. The State argued that, to the extent Barrett intended to present evidence about BWS, the evidence should be limited to evidence about interactions between her and Cobb and should not include details of the abuse Barrett allegedly suffered as a child or during the time she was homeless or was involved with other men. Defense counsel argued that the entirety of Barrett's traumatic life was vital to her case. The trial court initially stated that it had reviewed many of the cases on the BWS and had determined that testimony about Barrett's abusive father, an alleged gang rape, and prior abusive relationships would not be relevant to the facts of this case. The court also determined that the prejudicial effect would outweigh the probative value of the evidence. (R. 14-15.) The State conceded that past interactions between Cobb and Barrett would be admissible, but that testimony about other parties and Barrett should not be admitted. (R. 32, 34.)
The parties conducted additional research and argued to the trial court on the *Page 945 
following day. The prosecutor argued that the cases involving BWS discussed cycles of abuse by the battering spouse and involved a history of intensifying threats and abuse from that person toward the abused spouse. (R. 43-44.) The trial court stated that it would allow defense counsel to present testimony at the hearing from his expert and any other witnesses. The court stated it had to be satisfied, first, that BWS existed in this case. The court noted that the report submitted by the defense expert, Dr. Alan Shealy, did not refer to any existing relationship between Cobb and Barrett. (R. 76.) The court stated that it had to determine whether the proffered evidence was relevant, and that it was inclined to rule that evidence of abuse inflicted by anyone other than Cobb would not be relevant or admissible. The court further stated that it believed that the prejudicial value would outweigh any probative value of such evidence. (R. 93-94.)
Barrett testified at the pretrial hearing regarding sexual abuse by her older brother, which she alleged she suffered between the ages of 6 and 12 years; she said that her mother was aware of the abuse but that she did nothing to stop it. She testified that her father was physically abusive to her. She said that she had been married to or involved with several other men who had physically abused her and raped her. Barrett testified that during a period when she was homeless, she was beaten and robbed, and that she was once kidnapped and gang-raped by six men.
Barrett described her relationship with Cobb as "drinking buddies." (R. 118.) She claimed that, when they were drunk, Cobb often was aggressive toward her sexually and when she rejected his advances, he threatened her and hollered at her. Barrett also testified about her version of events on the night she stabbed Cobb.
Dr. Shealy testified that he was a psychologist with extensive training and experience. He testified that BWS was popularized by Dr. Lenore Walker. Dr. Walker described three or phases to BWS. Dr. Shealy explained:
 "The first aspect would be the tension phase where there would be — the male partner would be building up to violence. And the second stage would be the actual battering or the violence. And the third stage would be the, what [Dr. Walker] called, the honeymoon phase or the making up phase. So that's the classical sort of description of battered woman's syndrome."
(R. 141.)
Dr. Shealy stated that a woman's childhood and adolescence and past relationships factor into whether she suffers from BWS; he further stated, "Just because a woman has had situations where she's been abused or has been powerless in the past doesn't mean necessarily that she would be a battered woman in the future." (R. 145.) Dr. Shealy explained that BWS "can be used to describe a woman's situation where there is no violent act that would require a self-defense theory." (R. 146-47.) Finally, Dr. Shealy testified that he believed that Barrett suffered from BWS and that at the time of the offense, she believed she was in imminent danger.
The court asked Dr. Shealy whether the theories about BWS "presuppose a relationship between the two individuals," i.e., the batterer and the victim, and Dr. Shealy acknowledged that the theories do so. (R. 164.)
After hearing the testimony, the trial court determined that the record did not support a finding that Barrett suffered from BWS, and that the defense could not go forward with that theory. The court stated that the characteristics of BWS, as recited by Dr. Shealy and as included in *Page 946 
Alabama cases, involved the tension phase, the battering phase, and the honeymoon phase, and there was no testimony that these phases existed in this case. (R. 175, 179-80.) The court also stated that testimony about BWS would not be relevant. (R. 179-80.) The court stated that it was not precluding testimony about prior instances of abuse between Barrett and Cobb. (R. 180.)
During the trial, Barrett asked the trial court to reconsider the earlier ruling and to permit her to present evidence about her childhood and her previous abusive relationships, and to show how her experiences led her to display the characteristics associated with BWS. The trial court declined to allow Barrett to present the evidence, accepted as a proffer of evidence the testimony at the pretrial hearing, and stated that the argument was preserved for the record. (R. 412-16.) The trial court again stated that evidence regarding abuse by anyone other than Cobb would not be relevant in this case, and that the probative value of the evidence would be outweighed by its prejudicial value.
"The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins,771 So.2d 1093, 1103 (Ala. 2000).
 "To be competent and admissible, evidence must be relevant — that is, evidence must tend to prove or disprove the issues before the jury. Rule 401, Ala. R. Evid. The determination of the relevancy and admissibility of evidence rests largely in the sound discretion of the trial judge. The trial judge is obliged to limit the evidence to that evidence that would be necessary to aid the fact-finders in deciding the issues before them, and to preclude evidence that is too remote, irrelevant, or whose prejudice outweighs its probative value. Loggins v. State, 771 So.2d 1070, 1077-78 (Ala.Crim.App. 1999), aff'd, 771 So.2d 1093 (Ala. 2000)."
Harrington v. State, 858 So.2d 278, 293 (Ala.Crim.App. 2002).
The trial court correctly determined that, before the evidence about BWS could be admitted at trial, it had to be relevant. As Dr. Shealy testified at the pretrial hearing, BWS presupposes a relationship between the batterer and the abused partner, and BWS has three phases: the tension phase, the battering phase, and the honeymoon phase. The substance of the expert's testimony is reflected in Alabama caselaw. For example, in Bonner v. State,740 So.2d 439 (Ala.Crim.App. 1998), this Court stated:
 "However, generally, a battered woman `is or has been in an intimate relationship with a man who repeatedly subjects or subjected her to forceful physical and/or psychological abuse.' Lenore Walker, The Battered Woman Syndrome 203 (1984).
 "`The violence associated with this type of relationship is neither constant nor random. Instead, it follows a pattern. Dr. [Lenore] Walker identified a three-stage cycle of violence. The first stage is the "tension building" phase, during which small abusive episodes occur. These episodes gradually escalate over a period of time. The tension continues to build until the second stage — the acute battering phase — erupts. During this phase, in which most injuries occur, the battering is out of control. Psychological abuse in the form of threats of future harm is also prevalent. The third phase is a calm, loving period during which the batterer is contrite, seeks forgiveness, and promises to refrain *Page 947 
from future violence. This phase provides a positive reinforcement for the woman to continue the relationship in the hope that the violent behavior will not recur. The cycle than repeats itself.
"`. . . .
 "`In sum, the battered woman feels "trapped in a deadly situation." Caught in this cycle, she sometimes strikes back and kills.'
 "Paul C. Giannelli and Edward J. Imwinkelreid, Scientific Evidence, § 9-3, pp. 268-73 (2d. ed. 1993)."
740 So.2d at 441-42.
The trial court correctly determined that the evidence failed to establish that the three phases of this cycle existed between Cobb and Barrett. Further, the trial court correctly found that Barrett failed to establish that she was engaged in an intimate or long-term relationship with Cobb. To the contrary, Barrett described Cobb as her "drinking buddy," although she acknowledged that they had had consensual sex on a few occasions. In her statement to the police on the night of the stabbing, Barrett said that Cobb knew that an older man, Roger, was her "number one man." (C. 263.) Thus, the evidence indicated, at most, that Barrett and Cobb were friends who drank excessive amounts of alcohol together and sometimes engaged in consensual sexual activity. Nothing indicated that their relationship established the characteristics of BWS in Barrett, as that syndrome was described by Dr. Shealy and has been described in caselaw. Because BWS was not established by the evidence and was not relevant in this case, the trial court acted well within its discretion to preclude Barrett from presenting testimony about BWS or about her alleged previous abusive relationships.
It is important to note that the trial court permitted Barrett to present evidence about Cobb's alleged prior acts of abuse toward her and to argue that she was acting in self-defense when she stabbed Cobb. The trial court fully instructed the jury on self-defense, and the jury found Barrett guilty of the lesser-included offense of second-degree assault.
The trial court here conducted an extensive hearing on this issue, permitted the parties to present witnesses and to argue their positions fully, and researched the relevant caselaw on BWS. After a thorough consideration of the issue, the trial court determined that the evidence did not support the BWS theory of defense and that the only relevant evidence was evidence about any abuse Barrett had suffered during her interactions with Cobb. Based on our review of the record, we cannot find that the trial court abused its broad discretion in this case. Therefore, Barrett is not entitled to any relief as to this claim of error.
 II.
Barrett next argues that the trial court erred when it admitted evidence of prior bad acts after the State failed to provide her with notice of its intention to offer the evidence, as required by Rule 404(b), Ala. R. Evid. Barrett filed a motion seeking notice from the State regarding any prior bad acts it intended to introduce into evidence. (C. 26-27.) During the redirect examination of Cobb, the prosecutor asked about "something unusual" happening approximately two weeks before this incident while Cobb, Barrett, and a neighbor, Cathy McDaniel, were grilling out at Cobb's house. (R. 337.) Barrett objected on grounds that she had not received notice of any prior bad act testimony, and the trial court overruled the objection. Cobb then testified that Barrett had stabbed him in the leg with a knife on that occasion. *Page 948 
Although the State concedes that it failed to provide Barrett with notice of its intent to present evidence of prior bad acts, it contends that Barrett failed to show that she was prejudiced by the admission of the testimony. We are not persuaded by the State's bold assertion that Barrett was not prejudiced. "`Evidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant. It interjects a collateral issue into the case which may divert the minds of the jury from the main issue.'" Ex parte Casey, 889 So.2d 615, 622
(Ala. 2004) (quoting Ex parte Cofer, 440 So.2d 1121, 1124 (Ala. 1983)). However, we find no reversible error in this case because the same evidence was admitted at trial without objection from Barrett. "Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred."Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App. 1993) (citations omitted).
Cobb testified that Cathy McDaniel was present when Barrett stabbed him in the leg. McDaniel testified without objection at trial that she was at Cobb's house a couple of weeks before this incident took place, and that she, Barrett, and Cobb were grilling out. She testified that she heard Cobb and Barrett arguing in the house and that Cobb shouted for her to come inside. McDaniel testified that she hesitated and that Cobb shouted for her again so she went inside. She said that Cobb had his arms around Barrett and that Barrett was holding a pair of scissors. Cobb told her that Barrett was trying to cut him. McDaniel took the scissors from Barrett and hid them.
McDaniel testified that Cobb went inside the house a short time later and she heard him scream for her again. McDaniel continued, without objection, "And it was almost like a frightening scream. You know, `Cathy, come back in here.' And when I went in [Barrett] had a very large kitchen knife in her hand in this position." (R. 355.) Cobb was restraining Barrett by her wrists, McDaniel stated, and he asked McDaniel to take the knife from Barrett. McDaniel testified that she took the knife from Barrett and hid it.
Although Cobb's testimony about Barrett's stabbing him with the knife while grilling out at his house was not admissible because the State did not first notify her of its intent to offer it into evidence, the evidence was rendered innocuous because McDaniel testified in detail and without objection about the incident and because she further testified without objection about an incident involving Barrett threatening Cobb with scissors on the same occasion. Therefore, Barrett is not entitled to any relief on this claim of error.
For the reasons discussed above, we affirm the conviction and sentence imposed in this case.
AFFIRMED.
McMILLAN, P.J., and BASCHAB and SHAW, JJ., concur. WISE, J., not sitting.
 *Page 140