[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 280 
Jaime Denise Harrington was charged with murder following the shooting death of her common-law husband, Anthony Moen. § 13A-6-2, Ala. Code 1975. Following a jury trial, Harrington was convicted of the lesser-included offense of reckless manslaughter. The trial court sentenced Harrington to serve 12 years in the penitentiary. This appeal follows.
The evidence presented at trial disclosed the following. Jaime Denise Harrington and Anthony Moen met when Harrington was approximately 15 years old and Moen was 21 years old. They lived together as common-law spouses for over seven years, and they had two children together. Alfred Loucks, the victim's stepfather, testified that on May 27, 2000, Moen, Harrington, and their two children were living with Loucks and his wife. Loucks testified that Moen and Harrington "fussed a lot," but that he was not aware that Moen had abused her. He acknowledged that, on May 17, 2000, he posted bond to secure Moen's release from jail following his arrest on a harassment charge filed by Harrington. *Page 281 
Loucks said that he and his wife returned from a trip on May 27, 2000, and upon entering their home, he observed Moen on the couch. Harrington ran down the hall wearing blue jeans and a bra, and she asked where the telephone was located because she needed to call the police. She said there had been an accident. Harrington said that she had accidently shot Moen. Moen had been shot in the back of the head, but he was conscious and was able to talk to Mrs. Loucks. He told her that Harrington had shot him. Moen died the following day at a hospital.
Officer Alonzo Gibbs responded to the scene and found Harrington outside of the residence. Harrington stated that she had accidently shot Moen. Gibbs testified that Moen was on the couch and was in and out of consciousness. He told Gibbs that his girlfriend had accidently shot him, and he told the officer where the gun was located. The medical personnel who arrived at the scene before the police had responded to the call testified that Moen stated on several occasions that "she" had shot him intentionally.
The crime scene was examined, photographed, and videotaped. A .25-caliber shell casing was recovered, as was a .25-caliber handgun. Two plastic sandwich bags containing what appeared to be marijuana were in plain view and were recovered from the house. The house was described as very disorganized and dirty.
After she was transported to the police station, Harrington gave a statement which was videotaped. The video was played for the jury. Harrington initially claimed that the shooting had been accidental, but she later stated that that was not true. Harrington appeared to be extremely upset during the interview, and she spoke about Moen's abusing her. She told the police about an incident that occurred on May 17, 2000, when, she said, Moen drove her to a secluded location and placed a gun to her head.
The pathologist testified that Moen sustained a gunshot wound to the back of his head, a few inches behind and slightly below his left ear. The bullet entered the skull, injured the brain, and caused Moen's death. He testified that the gun was at most a few inches from Moen's head when the shot was fired. Toxicology tests revealed that at the time of his death Moen had cocaine in his system.
Dr. Guy Renfro, a psychologist, testified that he had conducted a psychological evaluation of Harrington pursuant to a court order directing him to determine her competency to stand trial and her mental state at the time of the crime. Pursuant to that order, he conducted a clinical interview and administered two tests. The test results indicated that Harrington's responses to the tests were valid and that she was not "trying to make herself out to be worse than she was or better than she was." (R. 309.)
Dr. Renfro testified that he found it significant that Harrington's parents divorced when she was 12 years old, and she had a great deal of difficulty after the divorce. Specifically, she ran away from home, had problems when her mother remarried, and she alternated living with her mother and her father, who sometimes lived in Arkansas. When Harrington met Moen, she was 15 years old and on her own, living with friends. Dr. Renfro testified that, when Harrington and Moen met, she was vulnerable and looking for stability, "looking for someone who could love her or take care of her, and that's who she picked, someone who was older, who was more experienced in the world, who seemed to tell her what to do and how to do it." (R. 302.) *Page 282 
Dr. Renfro made multiple diagnoses for Harrington: he found that Harrington was suffering from chronic post-traumatic stress disorder (PTSD), chronic major depression, and a personality disorder with patterns of relating to people in ways that created difficulty for her and/or others. Dr. Renfro described PTSD as follows:
 "When a person has been exposed to a potentially life-threatening situation, either direct[ed] towards them or witnessing it towards someone else, or even learning about it from somebody else, and they feel powerless, helpless, and experience great fear. The human being tends to develop a pattern of common reactions. These common reactions have been diagnosed or put into [the] category of post-traumatic stress disorder. They typically involve the individual re-experiencing, to some degree, the traumatic event, maybe by spontaneous recollections, just remembering it, having events, dates, objects, people trigger those memories, disturbing dreams or nightmares, or, what's commonly called, flashbacks that refer to very intense and vivid re-experiencing of the event.
 "The second component of post-traumatic stress disorder is the person either tends to try to avoid those situations that remind them of that or that they develop an emotional numbness where they just seem not to react like most people would."
(R. 304-05.) The witness stated that any repetitive situation, including sexual and physical abuse, could cause PTSD. Dr. Renfro testified that fear is a central component in the diagnosis of PTSD. He stated, "The person has to be exposed to a situation that would cause almost anyone to fear for their life or fear that they would be harmed. . . . So when it's fear, intense fear, the person feels helpless, unable to do anything." (R. 310.) Dr. Renfro said that Harrington reported that Moen had sexually abused her; he had held her down, had raped her, had sodomized her, and had forced her to be photographed while nude. The sexual abuse was important to his diagnoses. Dr. Renfro testified that the PTSD symptoms arose in Harrington's relationship with Moen, when Harrington started to anticipate when Moen was "about to go off, he's about to go crazy, that sort of thing, that is part of the post-traumatic stress disorder." (R. 355.)
Dr. Renfro further testified that, based on his review of police reports and witness interviews provided by the prosecutor and based on reports Harrington gave and which he corroborated to some extent by speaking to others who knew her, he determined that there had been an increasing pattern of physical violence toward her by Moen. He described an event that occurred in early May 2000, in which Moen took Harrington to an isolated area, became aggressive and violent, placed a gun to her head and told her to make her peace with God. Following "some arguing and raving," Moen allowed Harrington to get back in the truck. He then took her from the area and dropped her off.
Dr. Renfro viewed the videotape of Harrington's statement to the police. He found it helpful because it provided information about Harrington's mental state at the time of the crime. Dr. Renfro testified that victims of domestic violence typically remain at the scene; they do not run away from the scene and create an alibi. Regarding the videotape, Dr. Renfro further stated:
 "Certainly, there were things she said and emphasized that would indicate that this was a building process of fear — repeated fear, incidents of helplessness, reaching out to law enforcement officials *Page 283 
for protection from the ultimate victim in this case, and feeling helpless like she would be not be helped by this person."
(R. 314.) He observed that one year before this incident, during the Jubilee City Fest in 1999[2], Moen and Harrington had a very large altercation and Moen threatened her because she planned to attend the festival with a person Moen did not like. Dr. Renfro testified that Jubilee City Fest and the month of May brought back associations for Harrington. Furthermore, Dr. Renfro noted that Harrington talked in her statement to the police about the automatic pistol that Moen had given her to protect herself. The pistol was the same one that Moen had placed to her head a few weeks before the shooting when Moen told her he was going to kill her. Dr. Renfro testified that he was certain that the pistol caused Harrington to experience flashbacks of what he said would have been an extremely traumatic incident. (R. 315-16.)
Dr. Renfro provided a detailed explanation of his opinion of how Harrington's fear of Moen related to her acts on May 27, 2000:
 "[P]eople who are in an abusive relationship, [there are] cycles, that there's a tension buildup. And the person who has typically been the victim of the abuse starts noticing signs that the person is about to go off, the person has had physical abuse. It's like they hear the ticking of the time bomb going off, and they know it's there. And I think Ms. Harrington's statement to the police officers that were shown on the tape indicated that sometimes he would get very nice to her. Immediately, prior to the time, he would become very violent or threaten her or threaten to take away her children. And so I think that was the fear that she had. I think that's why two different times she would approach the police, try to get him arrested. There was even some indication that she tried to get him arrested for something else so that he would be kept away from her long enough to get away, but all of those had failed.
 "So the fear was building, there was an opportunity, the weapon was there. The weapon itself served as a trigger for memories of the abuse that she had and the opportunity was there. And in cases where there have been murders after domestic violence, two-thirds of those occur either when the victim is asleep, walking away, or is in some seemingly harmless position. That is a much more common finding on these."
(R. 317.)
Dr. Renfro was questioned about the reasonableness of Harrington's fear of Moen on the day of the shooting:
 "Q. [Defense counsel] Do you feel that her fear of Anthony Moen was reasonable on that date?
"A. [Dr. Renfro] Yes, I do.
"Q. And why do you say so?
 "A. It's — everything from, as you've said — as you've pointed out, the history of their relationship. Mr. Moen was a very powerful figure to her. He was five [sic] years older when they met. She was basically a child when they met. They continued a relationship where he was very dominant over her. They had their ups and downs. Each of them did some things that were not good in the relationship. But he was a very powerful, very frightening figure to her. *Page 284 
 "I think even, in the tape, she made references to attempting to lock a door to the truck, but she said why risk the chance of getting my nose broken added to whatever is going to happen to me because he is so powerful to her.
 "So I think he was very powerful and very frightening to her. And, at that moment, I think she felt that she had little other recourse in terms of leaving and going some place. He apparently had taken their children at times and places — in places where she did not know where her children were at. He was very powerful and yet she was very fearful from him at that particular moment."
(R. 318-19; emphasis added.)
Dr. Renfro testified to the threats of harm and death Moen had made to Harrington over the course of their relationship, and he noted that the threats intensified during the last two years of the relationship. Dr. Renfro again stated that he believed that on the day of the shooting Harrington was in fear for her life. (R. 322.)
Finally, defense counsel read a statement from a report on a research study conducted by the Department of Justice, "`A woman's mental state during an assault on her abuser can be determined by her immediate intense reaction to perceive danger or by post-traumatic reactions to prior trauma.'" Dr. Renfro testified that he agreed with that statement. (R. 357.)
Carole Veronese testified that she was employed at a local business and that Harrington worked at the business from January 27, 1999, to April 1, 1999. She said that Moen contacted Harrington "constantly" during her brief employment with the company. Veronese said that, after Harrington finished a telephone conversation with Moen, she was very upset and cried. Harrington was emotionally upset every day she was at the office. Veronese further testified that Moen repeatedly threatened Harrington and that Harrington was "terrified of him." (R. 361.) On at least three occasions, Harrington expressed her fear that Moen was going to kill her, and she expressed some type of fear regarding Moen every day. Veronese testified that Harrington was terminated because the company employees were frightened of Moen. She explained, "We felt — we believed he was on drugs, and we didn't know if he would get mad enough at Jaime to come and go berserk and hurt somebody there. We felt like the whole company was in jeopardy." (R. 365.) Veronese acknowledged that she did not see Moen strike Harrington and that he never threatened Harrington in her presence, but she said she believed what Harrington had reported to her.
Tanya Defe testified that in May 2000, she accompanied Harrington to the police department to file a warrant for Moen's arrest because he had held a loaded gun to Harrington's head. When they left the police station, Defe took Harrington to a friend's house so that Moen would not find Harrington. Harrington was emotionally distraught, Defe said. On cross-examination, Defe acknowledged that she had known Harrington to take illegal drugs.
Thomas Venable testified that on May 17, 2000, Tanya Defe and Harrington went to his house. He said that he assisted them in placing telephone calls to the Montgomery County District Attorney's Office and to a woman's abuse shelter in an attempt to get Harrington into protective custody. The next day, Venable picked Harrington up at her workplace and again took her to his house. Moen and a friend of his arrived at Venable's house as Venable and Harrington arrived there. He said that Harrington began crying when she saw Moen and that she *Page 285 
could not believe that had he found her there. She was frightened of him, Venable said, and said she was afraid Moen was going to kill her. Moen talked to the frightened and sobbing Harrington, Venable said, and then she and Moen retrieved her belongings from Venable's house and they left. Venable said that Moen did not strike Harrington or physically force her to leave with him, but that he forced her "emotionally."
Harrington's mother, Jean Maddox, testified that she spoke to her daughter nearly every day and that she saw her once each week. Maddox said that in the year before the shooting Harrington was in a very bad emotional state. "She was terrified of Anthony [Moen]. She was afraid he was going to kill her. She was terrified." (R. 417.)
Maddox testified that on May 8, 2000, Harrington telephoned her at work; Harrington was very emotional, agitated, and upset. Maddox met Harrington at the police department that day because Harrington wanted to sign a warrant for Moen's arrest for menacing her. They were not able to obtain a warrant for Moen's arrest, and they then telephoned Legal Services, the women's shelter, an attorney, and the Alabama State Bar Association. They received no assistance from any of the places they telephoned. Harrington and her children went to her mother's house and spent the night. Moen telephoned her there, and Maddox observed her daughter during and after the conversation with Moen. She said that Harrington was "totally terrified. She was afraid he was going to come and get her and kill her." (R. 418.) Moen drove by Maddox's house several times that night. Harrington returned to her own house the next day.
Maddox testified that at approximately 6:00 a.m. on May 27, 2000, Moen telephoned her and asked if she knew where Harrington was because she had not come home the night before. During the telephone conversation, Moen apparently received a telephone call from Harrington. Moen then told Maddox that Harrington said she would be home in 15 minutes, and Maddox asked Moen to have Harrington call her when she returned. When Harrington called her mother, she said she had been out all night talking to a coworker about the trouble she had been having with Moen. Harrington also told her mother that she had been kidnapped that night; Maddox said, however, that she knew that the kidnapping story was a lie. While she was on the telephone with her daughter, Maddox heard Harrington tell Moen to put the gun down. She heard Moen say that the gun did not have a bullet in it, and Harrington told him there had been a bullet in it earlier and it must have fallen out. Maddox said that Moen and Harrington were not arguing, but were only talking about the gun he was holding. From the conversation she heard, Moen was not threatening Harrington with the gun. Maddox told Harrington to put the gun away so the children did not get hurt.
On cross-examination, Maddox acknowledged that Moen loved his children and spent time with them, but she said that he was not a good provider financially. She said the children adored their father. Maddox never saw Moen abuse his children. She said she had seen Moen abuse her daughter, but she admitted that in her statement to the police she had denied seeing him abuse her. Maddox said that Harrington was not going to leave Moen without taking her children, and that Moen had told Harrington that if he could not have her and the children, then no one would have them.
Finally, Maddox testified that during the course of Harrington's relationship with *Page 286 
Moen, Harrington told her that Moen had slapped and kicked her, pulled her hair out, dragged her along the floor, and performed abusive sexual acts. Harrington also told her that Moen was very controlling and threatened that if she left him, he would find her and kidnap the children. Harrington told her mother that Moen had threatened her life on numerous occasions and described the various ways he planned to torture her. She was afraid to leave him, Maddox said, because she was afraid he would find her and kill her.
Dr. Barbara Manning testified that she had a doctorate in counselor education and that she had 19 years' experience working with battered women and over 9 years' experience working with battered women who had killed their mates. Dr. Manning testified about family violence and the ongoing behavior patterns involving force, threats, and intimidation the batterer uses to gain power and control over the victim. She stated that psychological abuse is considered to be the most damaging and difficult for a victim to overcome. Dr. Manning testified that domestic violence can cause a victim to suffer symptoms of post-traumatic stress disorder comparable to those experienced by soldiers who have been in combat. She stated that sexual abuse occurs in virtually every abusive relationship. Dr. Manning testified extensively about the characteristics of abusers. She said that abusers are often from dysfunctional homes in which they were abused as children. They have low self-esteem and want attention. She said that abusers can be charming, but that they are manipulative. They cannot handle stress and often lose their tempers without provocation, and they use force and intimidation to solve their problems. Dr. Manning testified that abusers often fear abandonment intensely. As a result, they isolate their mates from friends and family members, they are excessively jealous, and they check on their mates constantly.
Dr. Manning testified that abusive relationships involve a cycle of violence. She said that an abuser usually finds someone who is vulnerable, passive, and self-sacrificing. Following an initial period of peace and calm when the abuser is nice and loving, tension builds and the abuser becomes a different person. The abuser may experience a violent rage, apparently without warning, and may begin to threaten and degrade the mate in an attempt to gain power and control. After such an outburst, the abuser expresses sorrow and apologizes, and the victim forgives the abuser, thus setting up the cycle to be repeated. As time passes in an abusive relationship, Dr. Manning testified, the cycle discontinues and is replaced by constant fear of abuse and constant terror.
Dr. Manning testified that there are certain factors that are considered predictors of lethality in such a relationship: the abuser's behavior gets increasingly out of control — particularly when it is accompanied by drug and/or alcohol abuse; the abuser threatens to kill the victim and describes how he plans to carry out the threat; and the abuser holds hostage any children the victim has. Dr. Manning continued:
 "[E]ighty percent of the women who are killed in an abusive relationship are killed either after she has left the relationship or as she is trying to leave. Trying to leave a relationship is the most dangerous time. And if she's trying to do that and these other factors are present without intervention, there is predictably a lethal incident."
(R. 480.)
Dr. Manning and Dr. Renfro testified about the symptoms of depression and post-traumatic stress disorder that often occur in victims of abuse. When asked why a battered woman does not leave the *Page 287 
relationship, Dr. Manning explained that initially, the abuser "cons" her into returning by promising to change his behavior and telling her how much he loves her. She continued:
 "But as the abuse escalates and goes on, it gets more difficult. He tracks her down. She does leave. She is in danger if she stays. She is in danger if she leaves. He disables her car. He tears up her clothes. . . . He is going to get even with her somehow. Sometimes — he always threatens to kill her. He threatens to kidnap their children. She will never see them again. There are many reasons."
(R. 484-85.)
Jaime Harrington testified in her own behalf. She described meeting Moen when she was 15 years old and moving in with him at his parents' house. They lived together for seven and one-half years and had two children. Harrington stated that before she moved in with Moen, he was very understanding and made her feel safe. After they began living together, he became controlling and possessive, and he wanted to know where she was and who she was with at all times. Harrington stated that Moen raped her anally twice during the first months they lived together, and he physically abused her from the day she moved in with him. She said he hit her, threatened to kill her, described how he was going to kill her, and attempted to smother her repeatedly, which caused her to experience great anxiety. He threatened her with a gun or a knife on multiple occasions. Harrington said that Moen's parents were often not at home when those instances occurred.
Harrington stated that in a "typical" fight with Moen, he grabbed her hair and would "sling" her by her hair and force her to go wherever he wanted her to go by holding her hair. He typically hit her, threatened her, and slammed her against walls or doors, causing her to sustain bruises. Harrington said she also had suffered marks on her body and two black eyes, but that she did not seek medical attention for those injuries. She said Moen once held an electric appliance above the water as she sat in the bathtub and told her that if she could get out of the water in time, she would not be electrocuted. Harrington said that when she was employed, Moen contacted her by telephone or came to her workplace "constantly." He sometimes threatened her during those telephone conversations while she was at work, she said.
Harrington testified that Moen ingested marijuana on a daily basis and that he also used cocaine and crystal methamphetamine regularly.
Harrington testified that during Jubilee City Fest weekend in 1999, Moen became very angry with her because she had planned to attend the festival with a woman of whom Moen did not approve. When Harrington telephoned Moen to ask him if he objected to her attending the festival with the woman, he became irate and called her vulgar names. He told her that she could not return to their house because he would break her nose. As a result of the threat, Harrington and her children stayed with her friend at a motel. She telephoned the Sunshine Center, a local women's shelter, but did not follow up on the advice she was given because she misunderstood what the workers told her. During that evening, Moen placed calls to her cellular telephone numerous times; he left messages describing how he planned to torture her and mangle her body, and what he intended to do when he found her. She returned to their house the next day, she said, because he told her that he had been concerned about her and the children and was sorry for what he had said. *Page 288 
Harrington said she felt she had no other option, so she went back to him.
Harrington said that during the course of her relationship with Moen, she was in fear for her life. She said that during the last year of their relationship, Moen's threats to kill her became constant, and she knew that he was going to kill her. She said, "At any given time, I was looking for it." (R. 578.) Harrington testified that she did not go to the police during the first years of their relationship because she did not think the police could help her and because she was afraid that Moen would kill her if he discovered that she had gone to the police. When asked why she did not leave, Harrington testified:
 "Because I didn't think I had anywhere to go. I was scared to leave him. I couldn't get any — every time — every person or — I tried to get help from turned me away. I didn't want to go to my family, because where my family lives, he would stalk them. There's no — I mean, they cannot protect me from him."
(R. 578.)
Harrington said that in early May 2000, when she was not at her workplace where Moen expected her to be, he became very angry and, during the course of the morning, he left threatening messages on her cellular telephone. He picked up their older child from preschool and left a message informing Harrington that he intended to get the younger child and disappear with them. Harrington then contacted her mother and they went to the police department to sign a warrant for Moen's arrest. The police told her that a warrant could not be issued for verbal threats, so they called the Sunshine Center, Legal Aid, and an attorney, but could not get the immediate assistance that they sought. Harrington and her mother decided that Harrington would return to Moen and tell him that her mother had insisted that she and the children stay at her house; if they did not, Harrington's mother was going to telephone the Department of Human Resources. Moen allowed Harrington to take the children to her mother's house for one night.
A few days later, Harrington said, she and Moen got into an argument and she stayed away from home for two nights. Moen stayed at home with the children. He telephoned her on May 14, 2000, which was Mother's Day, and asked her to come home so they could work out their differences and so she could see their children. When she returned home, she said, he began arguing with her and threatening her. When they calmed down, Harrington told Moen that she had had two extramarital affairs. She also told him that she was being blackmailed by one of the men, Oscar James. Harrington said that James had formerly sold drugs to Moen. Harrington said that Moen "took it pretty well," and that he suggested they drive around and talk about it. He then drove them to an isolated location and stopped his truck. She said that she knew he was going to kill her. He forced her to the ground, placed a gun to the back of her head and told her to "get right with God" because she had only a few minutes to live. (R. 604.) Harrington said that she begged him not to kill her because it was Mother's Day and because their children were at home. He allowed her to get up and told her he could not kill her then because people knew that she was with him. She said that they went to a motel and took a nap.
Harrington said that she swore out a warrant against Moen three days later because she had left him again, and she had not wanted to go to the police until she had left him. Harrington described going to the police department with her friend, Tanya Defe, and telephoning the Sunshine *Page 289 
Center, Legal Aid, and the prosecutor's office. She said that she spent the night with a friend. She described Moen's finding her the next day at Thomas Venable's house, and she said she pleaded with Moen not to kill her. He told her he did not intend to kill her; he wanted to talk to her. He told her that their problem had been another person coming between them and he asked her to go home with him so they could work on their relationship. Harrington said she believed that she had no other choice, so she went home with Moen.
Harrington testified that, at approximately 9:30 p.m. on the night before the shooting, she left their house to look for employment at a business that she heard was hiring employees. She left the children with Moen. She encountered a friend at a gasoline service station near the business and accompanied the friend to a hotel where they ingested cocaine and talked about her problems with Moen until early the next morning. Harrington telephoned Moen at approximately 4:30 a.m. and told him she was at the gas station near the business. He said that he knew she was not at the gas station, because he was at the gas station with their children. Harrington said that Moen told her that when he found her he was going to hurt her. She hung up on him and went to the police department, but nothing was accomplished because the police told her they could not arrest him.
Harrington said that she had to concoct "a real quick reason as to why I was gone all night so he would not kill me." (R. 620.) She spoke with Moen by telephone and told him that a man who had been blackmailing her had found her at the gas station and had kidnapped her and kept her out all night against her will. She also told him that she had gone to the police department to sign a warrant for that person's arrest. Moen expressed his sorrow and told her to come home so she could see the children and they could talk about the situation. When she arrived home, he asked her again what had happened and she told him. Moen told her that he had telephoned her mother because he had been concerned about her, and told her to telephone her mother because she was worried. Harrington told her mother that she had been kidnapped.
Harrington said that, while she was talking to her mother, Moen was playing with the gun he had threatened her with a few days earlier. She said she was afraid that he was going to kill her, because she did not know whether he believed her kidnapping story. She said that during the morning Moen's behavior fluctuated between loving and concerned and agitated. He had a "psychotic look" on his face and talked about getting even with people who do anything to him. Harrington said she was terrified because "at any given moment, I knew I was going to die — at any given moment." (R. 626.)
Harrington said that Moen left the house twice that morning. When he left the first time, Moen gave her the gun and told her to put it somewhere so she could reach it in case someone came into the house while he was gone. She put the gun under her pillow when he left. The second time he left the house, he returned with food for the family. They had plans to take the children to the Jubilee City Fest, and Moen suggested they rest for a while before they left. Harrington said that, when she lay down with Moen, she was still frightened because she was afraid he was going to kill her. She dozed and was jarred awake by their younger daughter bouncing on the bed. Harrington said the first thing she thought of was getting the gun from beneath her pillow so that their daughter did not see it. She told their daughter to go into the bathroom and she *Page 290 
pulled the gun from beneath her pillow. Harrington testified: "I got off the bed. Instead of putting the gun on the TV, I — I pointed the gun, and I turned my head and I pulled the trigger." (R. 630.) She explained further, "I was scared at any given moment that he was going to get up and kill me." (R. 631.)
The shot did not kill Moen. He began screaming for help; he did not know what was wrong. Harrington told him that she thought he was having a heart attack. Moen accused her of shooting him, and she denied it, "because I was scared that he was going to come after me still if he knew I had shot him." (R. 632.) Moen could not see, and she continued to tell him she thought he was having a heart attack. Moen's parents arrived at that time, and Harrington told them that she had accidently shot Moen. She initially told the police that the shooting was accidental, too.
On cross-examination, Harrington acknowledged that in May 1999, when Moen had become angry when she wanted to go to Jubilee City Fest with a girlfriend, she had spent a few hours with Arthur Pettaway, a coworker of hers and a friend of Moen's, and had had sex with him before she asked Moen if she could attend Jubilee. After that occasion, she continued to have sexual relations with Pettaway. Harrington acknowledged that she had also had an affair with Oscar James, a close friend of Moen's, not long after she began her affair with Pettaway. Her relationship with James ended in May 2000, she said. Harrington testified that she first had sexual relations with James on the day he told her that he knew that she was having an affair with Arthur Pettaway. Harrington denied having sexual relations with any other men in April or May 2000. She denied knowing Joseph Glover, with whom, the prosecutor said, she also had sexual relations.
Harrington stated that when she told Moen in May 2000 about her affairs with Oscar James and Arthur Pettaway after she had been away from home the night before, Moen did not react with violence or anger during the conversation. Later that day, when Moen took Harrington for a ride, he drew a gun and threatened her, she said. Three days later, she swore out a warrant for his arrest, and the police took him into custody. She spent that night away from home, but returned the next day. When she returned, Moen did not physically abuse her or inflict any harm upon her. The day after Moen was arrested, Harrington and Moen spent time with Moen's step-father. She told Moen's stepfather that she had been using drugs and that she wanted to get help. She also told him that she had fabricated the story about Moen's holding a gun to her head; Harrington testified that Moen told her to make that statement to his stepfather.
Finally, Harrington testified that when she returned home on the day of the murder, Moen was concerned about her welfare because she had spent the night away from home and she had told him that she had been kidnapped. She admitted that Moen did not threaten her physically that morning. He gave her the handgun when he left their house, and he did not take it from her when he returned. Harrington said that she did not leave with her children when Moen was away from the house because she had no car keys, and she did not call anyone because she had no telephone. She said that she had not previously left Moen because she did not have anywhere to go, and because she believed Moen would find her wherever she might have gone.
In its rebuttal, the State presented the testimony of Moen's stepfather. He stated *Page 291 
that on the same day in May 2000 that his son had been arrested on a charge of menacing, his son and Harrington had come to his house. Harrington told him and his wife "that her friends had been playing Anthony and her against each of them, and that she wanted to get her life straight and go on." (R. 734.) Harrington told them that she had been on drugs and that she wanted to get into a drug-rehabilitation facility. Harrington did not appear to be frightened, he said; she seemed very calm.
Arthur Pettaway testified that he had worked with Harrington and that he had a sexual relationship with her. He denied knowing Anthony Moen or Oscar James. He denied blackmailing Harrington into having a sexual relationship with him. Pettaway testified that on several occasions, Harrington told him that she was afraid that Moen was going to hurt her.
Oscar James testified that he met Harrington because he had sold marijuana to Moen and had developed a friendship with him. He and Harrington began a consensual sexual relationship a few months after he met Moen. James denied knowing Arthur Pettaway. James stated that Harrington had told him that Moen had threatened her. He also stated that "the whole rumor through the neighborhood" was that Harrington and Moen fought all the time and that she threatened to do something to Moen if he left her and Moen threatened to do something to Harrington if she left him. (R. 759.) Finally, James acknowledged that at the time of his testimony he was in custody on a charge of possession of a controlled substance.
Joseph Glover testified that he met Harrington "through two other guys" in May 2000. He stated that he had sexual relations with her once, and that he ingested controlled substances with her. Glover testified that at the time of his testimony he was on probation for a drug-possession conviction.
 I.
Harrington first argues that the trial court erred when it granted the State's motion in limine and excluded evidence of Moen's 1991 criminal activities and testimony regarding his abuse of a former girlfriend. The State contends that Harrington failed to preserve this issue for review, because, it says, she did not attempt to present the evidence during the trial.
 "In Bush v. Alabama Farm Bureau Mutual Casualty Insurance Company, Inc., 576 So.2d 175 (Ala. 1991), the Alabama Supreme Court stated the general rule regarding motions in limine:
 "`We recognize that the trial court has broad discretion in evidentiary matters. The general rule was stated in State v. Askew, 455 So.2d 36
(Ala.Civ.App. 1984), citing C. Gamble, The Motion in Limine: A Pretrial Procedure That Has Come of Age, 33 Ala.L.Rev. 1 (1981), as follows:
 "`"In keeping with the vesting of broad discretion in the trial court in this area, it is generally held that the granting of a motion in limine can never be reversible error. The non-moving party may repeat at trial, preferably out of the hearing of the jury, his request for permission to prove the contested matter. This offer of proof is required in order to isolate the error for appeal. It is this refusal at trial to accept that proffered evidence, not the granting of the pretrial motion in limine, that serves as the basis for reversible error. Of course, this ability to bring up the matter a second time would not be available if counsel had requested and the *Page 292 
judge had granted a prohibitive-absolute motion in limine.'"
 "`455 So.2d at 37 (Ala.Civ.App. 1984). In Perry v. Brakefield, 534 So.2d 602, 607 (Ala. 1988), this Court cited Professor Gamble and stated: "The clear holding of these cases is that unless the trial court's ruling on the motion in limine is absolute or unconditional, the ruling does not preserve the issue for appeal." 534 So.2d at 606.'
 "576 So.2d at 177-78. See also Evans v. Fruehauf Corp., 647 So.2d 718
(Ala. 1994); Boros v. Baxley, 621 So.2d 240 (Ala.), cert. denied, 510 U.S. 997, 114 S.Ct. 563, 126 L.Ed.2d 463 (1993); Jackson v. State, 836 So.2d 915 (Ala.Crim.App. 1999); and Morton v. State, 651 So.2d 42
(Ala.Crim.App. 1994).
 "There is no evidence that the trial court's ruling on the motion in limine in this case was absolute or unconditional, and the record reflects that Bowles did not offer the contested evidence at trial and obtain a specific adverse ruling from the trial court. Accordingly, this issue was not preserved for appellate review."
Bowles v. State, 784 So.2d 1077, 1079 (Ala.Crim.App. 2000) (some emphasis in original; some emphasis added).
We question whether this issue has been preserved for review. During the hearing on the motion in limine, the trial court considered the arguments of counsel and the testimony from the victim's former girlfriend, then granted the State's motion. Nothing in the court's ruling indicated that the ruling was unconditional or absolute. After the State presented its case, Harrington made a motion for a judgment of acquittal, and the court heard argument on the motion. After it denied Harrington's motion, the court noted that it had previously held that evidence of specific acts of prior drug use by the victim were inadmissible, but that Harrington's videotaped confession referred to the victim's drug use. The court stated that the State's evidence might have opened the door to general testimony of the victim's drug use, though testimony about specific incidents would not be permitted. The trial court stated that, because the taped statement referred to the victim's arrest on drug charges, Harrington could testify about the victim's arrest on drug charges. One of the prosecutors then stated that he thought defense counsel was "alluding to the 1991 incident," and the trial court stated, "No. I'm not letting you get into the 1991. I'vealready ruled on that." (R. 290; emphasis added.) The matters the State sought to exclude in its motion in limine related to the victim's 1991 criminal charges for abusing a former girlfriend. (C. 79, R. 14-20.) However, it appears from the record that the comment about "the 1991 incident" referred to a drug-related incident, rather than to the victim's abuse of a former girlfriend. Harrington did not attempt to present any testimony from the victim's former girlfriend, nor did she raise the issue at trial until she made a motion for a mistrial after all of the evidence had been presented. (R. 774.) Therefore, we do not believe that the prosecutor's and the trial court's references to "the 1991 incident" was sufficient to preserve for appellate review the issue whether the evidence regarding the victim's alleged abuse of his former girlfriend was properly excluded.
Even if the issue had been preserved for review, however, Harrington would not be entitled to any relief. The decision whether to grant or to deny a motion in limine rests within the sound discretion of the trial court and its decision will not be overturned on appeal absent an abuse of discretion. Ex parte Jackson, 836 So.2d 979 (Ala. 2002). We find no *Page 293 
abuse of discretion on the facts presented here.
Harrington argues that Rule 404(a)(2)(A), Ala. R. Evid., permits evidence of a victim's relevant character trait, and that Rule 405, Ala. R. Evid., provides that, when character evidence is an essential element of a defense, proof of the character trait can be offered through specific instances of conduct. Rule 404(a) provides:
 "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
". . . .
"(2) Character of Victim.
 "(A) In Criminal Cases. (i) Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same. . . ."
Rule 405(b) provides:
 "Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct."
To be competent and admissible, evidence must be relevant — that is, evidence must tend to prove or disprove the issues before the jury. Rule 401, Ala. R. Evid. The determination of the relevancy and admissibility of evidence rests largely in the sound discretion of the trial judge. The trial judge is obliged to limit the evidence to that evidence that would be necessary to aid the fact-finders in deciding the issues before them, and to preclude evidence that is too remote, irrelevant, or whose prejudice outweighs its probative value. Loggins v.State, 771 So.2d 1070, 1077-78 (Ala.Crim.App. 1999), aff'd, 771 So.2d 1093
(Ala. 2000). The trial court here could have reasonably determined that evidence in the form of testimony from the victim's ex-girlfriend regarding abuse that occurred nine years earlier was too remote and irrelevant to be admissible. The alleged abuse of the former girlfriend occurred two years before Harrington met the victim, and Harrington was involved with the victim for more than seven years. Furthermore, Harrington testified that the victim had at least implied to her that he had been incarcerated after a former girlfriend had him arrested. Based on the totality of the circumstances, we do not find that the trial court erred in determining that the evidence of Moen's abuse of a former girlfriend was inadmissible, and we do not find that the trial court abused its discretion in granting the State's motion in limine to exclude the evidence.
In summary, it does not appear from the record before us that Harrington preserved for review any claim regarding the motion in limine, because she did not raise the issue at trial or attempt to present the evidence to the jury. Even if she had preserved the issue for our review, she would not be entitled to any relief because the trial court properly exercised its discretion in granting the motion in limine.
 II.
Harrington next argues that the trial court abused its discretion when it precluded defense experts from expressing their opinions that Harrington was an abused woman and that Moen was a batterer. The State contends that the trial court correctly excluded the evidence because, it argues, the evidence would have been impermissible testimony as to the ultimate issue in the case. We find that the evidence should have been admitted at trial, but that the error resulting from its exclusion was harmless. *Page 294 
During the presentation of her case, Harrington presented the expert testimony of Dr. Barbara Manning and Dr. Guy Renfro. Each of these witnesses testified about the domestic violence Harrington experienced during her relationship with Moen and her psychological and behavioral responses to it, and about the characteristics and behaviors of persons who live in abusive situations. (R. 300-58, 471-95.) Harrington sought to have the witnesses testify, further, that Moen was a batterer and that she had the characteristics of a battered woman, but the trial court refused to permit that testimony. (R. 66-68, 70-71, 77-79.) Harrington argued that, under Bonner v. State, 740 So.2d 439 (Ala.Crim.App. 1998), expert testimony regarding whether the defendant is a battered woman is permissible and that by refusing to permit the testimony, the court denied her the right to present her defense. The trial court stated that Bonner
did not permit testimony about whether a person was a victim of abuse.
In Bonner v. State, this Court noted that battered woman syndrome (BWS) had been recognized by Alabama courts and by many courts throughout the country. We noted in Bonner:
 "The New Jersey Supreme Court, for example, found an expert's testimony on the subject of battered spouse syndrome `essential to rebut the general misconceptions regarding battered women' because this testimony `is aimed at an area where the purported common knowledge of the jury may be very much mistaken, an area where jurors' logic, drawn from their own experience, may lead to a wholly incorrect conclusion, an area where expert knowledge would enable the jurors to disregard their prior conclusions as being common myths rather than common knowledge.' State v. Kelly, 97 N.J. 178, 206, 478 A.2d 364, 378
(1984)."
740 So.2d at 440. This Court then noted that the Alabama Supreme Court had reached the same conclusion in Ex parte Haney, 603 So.2d 412 (Ala. 1992). In Haney, our supreme court noted that expert testimony on BWS can be admitted to assist the jury in understanding the syndrome, and also to help the jury determine whether the defendant had an honest belief that she was in imminent danger, as that determination related to a claim of self-defense. Id. at 414 (quoting State v. Koss,49 Ohio St.3d 213, 551 N.E.2d 970, 973 (1990), quoting in turn State v.Hodges, 239 Kan. 63, 68-69, 716 P.2d 563, 567 (1986)).
Although the trial court reached a different conclusion based on its interpretation of Bonner, we now write to clarify that nothing in our opinion in Bonner was meant to preclude an expert from testifying that a defendant has the characteristics of a battered spouse. A close reading of the case reveals that Bonner does not address that specific issue at all. In Bonner, this Court cited cases that had considered battered woman syndrome evidence. We cited State v. Hickson, 630 So.2d 172 (Fla. 1993), in which the court stated that, if a defendant chooses to rely on her expert's testimony as it relates to the facts of her case, she waives her right to refuse to submit to an examination by the State's expert on battered spouse syndrome (BSS). This Court in Bonner quoted State v.Kelly, a New Jersey case, which specifically held:
 "What the expert could state was that defendant had the battered-woman's syndrome, and could explain that syndrome in detail, relating its characteristics to defendant, but only to enable the jury better to determine the honesty and reasonableness of defendant's belief. Depending on its content, the expert's *Page 295 
testimony might also enable the jury to find that the battered wife, because of the prior beatings, numerous beatings, as often as once a week, for seven years, from the day they were married to the day he died, is particularly able to predict accurately the likely extent of violence in any attack on her. That conclusion could significantly affect the jury's evaluation of the reasonableness of defendant's fear for her life."
State v. Kelly, 97 N.J. 178, 207, 478 A.2d 364, 378 (1984) (emphasis added; footnote omitted).
This Court in Bonner also quoted State v. Koss. The Koss court stated, "Of course, a defendant attempting to admit expert testimony regarding the battered woman syndrome must offer evidence which establishes herselfas a `battered woman.'" 49 Ohio St.3d 218, 551 N.E.2d at 974 (emphasis added).
The Bonner Court, in quoting from Koss, quoted a portion of State v.Hodges, 239 Kan. at 68-69, 716 P.2d at 567, overruled on other grounds,State v. Stewart, 243 Kan. 639, 763 P.2d 572 (1988). The Hodges court addressed the admissibility of expert testimony on BWS, specifically stating, "The expert would be explaining to the jury the nature of the battered woman syndrome and giving an opinion whether the defendantsuffers from the syndrome." 239 Kan. at 73, 716 P.2d at 570 (emphasis added).
Based on the foregoing cases, which were cited in Bonner in the discussion in that case about the admissibility of expert testimony on the BWS, we find nothing to indicate any intent to prevent an expert from testifying on the issue whether the defendant on trial suffered from battered spouse syndrome. In the case before us, the trial court's decision on this issue was not without reason or analysis. However, a close reading of Bonner leads to the conclusion that the expert testimony offered here was not due to be excluded based on Bonner.
To the extent the trial court excluded the evidence on grounds that it would constitute an impermissible opinion on the ultimate issue in the case, we disagree. First, testimony that Harrington suffered from battered spouse syndrome would not be testimony on the ultimate issue. "`An ultimate issue has been defined as the last question that must be determined by the jury.' Tims v. State, 711 So.2d 1118, 1125
(Ala.Crim.App. 1997)." Fitch v. State, 851 So.2d 103, 116 (Ala.Crim.App. 2001). Whether Harrington suffered from the battered spouse syndrome was not the last question the jury had to determine in this case. The last question the jury had to determine involved Harrington's intent when she fired the weapon and the reasonableness of her belief that she needed to defend herself. Whether she was a battered spouse and whether Moen was a batterer would have provided the jury with information it could have used in reaching its determination of the ultimate issue, but that testimony would not have addressed the ultimate issue itself. Even if the jury had heard testimony that Harrington was a battered spouse and that Moen was a batterer, it would have been free to evaluate the remaining evidence and would have had the option of finding, as the State argued at trial, that Harrington acted with the intent to murder when she shot Moen. Testimony that Harrington was a battered spouse and that Moen was a batterer did not resolve the ultimate issue of Harrington's intent or the reasonableness of her belief in the need to defend herself. Therefore, the testimony should not have been excluded on grounds that it went to the ultimate issue in the case.
Second, even if the expert testimony could be construed as addressing the *Page 296 
ultimate issue, that characterization of the testimony would not render it inadmissible. This Court has repeatedly acknowledged an erosion of the rule that once precluded expert testimony on the ultimate issue. In Fitch v. State, we observed:
"This Court has said:
 "`Rule 704, Ala.R.Evid., provides that "[t]estimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact." However, in the case of expert testimony, enforcement of this rule has been lax. C. Gamble, Gamble's Alabama Rules of Evidence § 704 (1995). We have noted previously in Travis v. State, 776 So.2d 819 at 849 (Ala.Cr.App. 1997), that expert testimony as to the ultimate issue should be allowed when it would aid or assist the trier of fact, and the fact that "`"a question propounded to an expert witness will elicit an opinion from him in practical affirmation or disaffirmation of a material issue in a case will not suffice to render the question improper"'" (citations omitted); see also Rule 702, Ala.R.Evid. (stating that expert testimony should be allowed when it will aid or assist the trier of fact).'
"Henderson v. State, 715 So.2d 863, 864-65 (Ala.Crim.App. 1997)."
851 So.2d at 117. Accord, Henderson v. State, 715 So.2d 854, 855
(Ala.Crim.App. 1997); Perkins v. State, 808 So.2d 1041, 1106
(Ala.Crim.App. 1999), aff'd, 808 So.2d 1143 (Ala. 2001).
Therefore, even if the experts' testimony had been directed to the ultimate issue, and we conclude that it was not, the testimony should have been admitted because it would have aided the jury in its resolution of the case.
Based on the foregoing, we find that the trial court erred when it precluded the experts from testifying that Harrington was a battered spouse and that the victim was a batterer. However, after careful consideration of all of the testimony, and for the reasons discussed below, we hold that the trial court's error was harmless. Rule 45, Ala.R.App.P.
As demonstrated in the recitation of the facts earlier in this opinion, Harrington testified at length about Moen's threats and acts of physical violence. Furthermore, Harrington's experts offered extensive testimony on this precise issue. Dr. Manning testified about the characteristics of both a batterer and of a victim of domestic violence. Many of the characteristics about which she testified were consistent with previous testimony about Harrington and Moen and their pattern of interacting. Dr. Renfro testified repeatedly about Moen's physical and verbal abuse of Harrington. He diagnosed Harrington as suffering from post-traumatic stress disorder, testified in detail about the characteristics of the disorder, and explained that Moen's increasing verbal and physical abuse of Harrington exacerbated the condition. Dr. Renfro also testified extensively about Harrington's fear based on Moen's past abuse, about the cycle of violence associated with such domestic-abuse situations, and stated that Harrington's fear and belief that she needed to defend herself against Moen were reasonable. Dr. Renfro testified in detail about his reasons for determining that Harrington's fear was reasonable:
 "A. [Dr. Renfro] It's — everything from, as you've said — as you've pointed out, the history of their relationship. Mr. Moen was a very powerful figure to her. He was five [sic] years older when they met. She was basically a child when they met. They continued a relationship *Page 297 
where he was very dominant over her. They had their ups and downs. Each of them did some things that were not good in the relationship. But he was a very powerful, very frightening figure to her.
 "I think even, in the tape, she made references to attempting to lock a door to the truck, but she said why risk the chance of getting my nose broken added to whatever is going to happen to me because he is so powerful to her.
 "So I think he was very powerful and very frightening to her. And, at that moment, I think she felt that she had little other recourse in terms of leaving and going some place. He apparently had taken their children at times and places — in places where she did not know where her children were at. He was very powerful and yet she was very fearful from him at that particular moment."
(R. 318-19; emphasis added.)
Dr. Renfro then testified to the threats of harm and death Harrington had received from Moen over the course of their relationship, and noted that the threats intensified during the last two years of the relationship. Dr. Renfro again stated that on the day of the shooting, Harrington was in fear for her life. (R. 322.)
Therefore, defense counsel elicited substantial testimony that Harrington suffered from battered spouse syndrome. Although Dr. Renfro and Dr. Manning were not permitted to specifically label Moen as a "batterer" and Harrington as a "battered spouse," the labels would have added little, if anything, to the extensive testimony already offered by the experts. It was made clear to the jury, particularly from Dr. Renfro's testimony, that Harrington possessed the characteristics associated with an abused spouse and that Moen possessed the characteristics associated with an abuser. The trial court's ruling precluding the experts from using those labels resulted in no prejudice to Harrington. Therefore, the error was harmless and not reversible.
Although we have resolved this issue against Harrington and based on existing Alabama law, we believe that it is important to note that testimony on battered spouse syndrome has become increasingly significant because of the recent proliferation of domestic-violence cases. In this Court alone in the last few years we have considered several murder and capital murder cases involving former or estranged spouses. E.g., Key v.State, [Ms. CR-99-0220, March. 1, 2002] ___ So.2d ___ (Ala.Crim.App. 2002) (ex-husband chased ex-wife and her friend in their automobile and shot them after the vehicle crashed); Baker v. State, [Ms. CR-95-0292, Jan. 12, 2001] ___ So.2d ___ (Ala.Crim.App. 2001) (husband kidnapped and murdered his estranged wife with an automatic weapon); Borden v. State,711 So.2d 498 (Ala.Crim.App. 1997) (husband shot his estranged wife and her father on Christmas Eve in front of their children); Dunaway v.State, 746 So.2d 1021 (Ala.Crim.App. 1998), aff'd, 746 So.2d 1042 (Ala. 1999) (live-in boyfriend shot and killed girlfriend and set fire to their mobile home, also killing her infant son); Tankersley v. State,724 So.2d 557 (Ala.Crim.App. 1998) (ex-boyfriend stabbed ex-girlfriend to death following recent breakup); George v. State, 717 So.2d 827
(Ala.Crim.App.), rev'd, 717 So.2d 844 (Ala. 1996), on remand, 717 So.2d 849
(Ala.Crim.App. 1997), aff'd, 717 So.2d 858 (Ala. 1998) (husband shot his wife, rendering her paraplegic, and shot and killed two neighbors when she ran into their apartment for assistance); McGahee v. State,632 So.2d 976 (Ala.Crim.App.), aff'd, 632 So.2d 981 (Ala. 1993) (ex-husband murdered ex-wife while she was in a *Page 298 
college classroom). See also Railey v. State, 710 So.2d 477
(Ala.Crim.App. 1996) (boyfriend shot and killed his girlfriend during an argument). Moreover, we have seen an upsurge in local and national news reports regarding murders and murder-suicides involving spouses or former spouses.
In light of these and similar tragic events, a reevaluation of Alabama's body of law surrounding self-defense and battered spouse syndrome is necessary. It has become increasingly clear that leaving an abusive relationship may not, in fact, mean that the victim's safety is no longer threatened. As our own cases show, domestic violence often escalates to deadly levels.
The California Court of Appeal analyzed the importance of battered-woman-syndrome testimony in murder cases as follows:
 "There are generally three different purposes for which BWS evidence is relevant in murder cases. First, BWS testimony is relevant to a defendant's credibility because it assists `"the jury in objectively analyzing [the defendant's] claim of self-defense by dispelling many of the commonly held misconceptions about battered women."' (People v. Humphrey, . . . 13 Cal.4th [1073], at p. 1087, 56 Cal.Rptr.2d 142, 921 P.2d 1 [(1996)].)
 "Next, for both perfect and imperfect self-defense California requires that the defendant hold an honest belief that he or she is in imminent danger of death or great bodily injury from the victim. BWS is relevant to prove the defendant honestly believed she needed to defend against imminent death or great bodily injury. (People v. Erickson, . . ., 57 Cal.App.4th [1391,] at p. 1399, 67 Cal.Rptr.2d 740
[(1997)]; People v. Aris (1989) 215 Cal.App.3d 1178, 1185, 264 Cal.Rptr. 167, disapproved on another point in People v. Humphrey, supra, 13 Cal.4th at p. 1086, 56 Cal.Rptr.2d 142, 921 P.2d 1.)
 "The third purpose for which BWS testimony is relevant in a murder case, reasonableness, was established in People v. Humphrey, supra, 13 Cal.4th 1073, 56 Cal.Rptr.2d 142, 921 P.2d 1. In Humphrey, the defendant was charged with murder. She testified regarding abuse she encountered from the victim, and an expert testified on BWS. The defendant was convicted of voluntary manslaughter. (Id. at pp. 1080-1081, 56 Cal.Rptr.2d 142, 921 P.2d 1.) The jury was instructed it `could consider the evidence [of BWS] in deciding whether the defendant actually believed it was necessary to kill in self-defense, but not in deciding whether that belief was reasonable.' (Id. at p. 1076, 56 Cal.Rptr.2d 142, 921 P.2d 1.) The Supreme Court found that the trial court should have allowed the jury to consider the BWS testimony `in deciding the reasonableness as well as the existence of defendant's belief that killing was necessary.' (Id. at pp. 1076-1077, 56 Cal.Rptr.2d 142, 921 P.2d 1.)
 "In addition to the actual subjective belief discussed above, in order for a defendant to be acquitted based on self-defense, it must be shown the belief is objectively reasonable. In assessing objective reasonableness, `a jury must consider what "would appear to be necessary to a reasonable person in a similar situation and with similar knowledge. . . ." [Citation.] It judges reasonableness "from the point of view of a reasonable person in the position of defendant. . . ."' (People v. Humphrey, supra, 13 Cal.4th at pp. 1082-1083, 56 Cal.Rptr.2d 142, 921 P.2d 1.) `Although the ultimate test of reasonableness is objective, in determining whether a *Page 299 
reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found herself.' (Id. at p. 1083, 56 Cal.Rptr.2d 142, 921 P.2d 1.)"
People v. Jaspar, 119 Cal.Rptr.2d 470, 475-76, 98 Cal.App.4th 99, 107
(2002) (emphasis added).
California has included in its evidentiary rules a provision regarding testimony about battered spouse syndrome. Section 1107(a), Calif. Evid. Code (2002), provides:
 "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."
Missouri has also enacted a statute that specifically provides that battered-spouse-syndrome evidence is admissible on the issue whether the defendant acted in self-defense or in defense of another person. Mo. Ann. Stat. § 563.033 (1999). The Missouri Court of Appeals stated:
 "The `battered spouse syndrome' is recognized by statute in Missouri. § 563.033. Evidence of battered spouse syndrome is admissible in Missouri on the issue of self-defense because it explains what might otherwise be inexplicable — why the defendant chose to use deadly force in a situation where a reasonable person would simply leave the relationship. State v. Pisciotta, 968 S.W.2d 185, 189
(Mo.App.W.D. 1998)."
State v. Edwards, 60 S.W.3d 602, 613-14 (Mo.Ct.App. 2001) (emphasis added).
Numerous other state courts have discussed the admissibility of evidence of battered spouse syndrome. See, e.g., Trujillo v. State,953 P.2d 1182 (Wyo. 1998); State v. Steele, 178 W. Va. 330, 359 S.E.2d 558
(1987) (citing numerous cases from other states); State v. Hickson,630 So.2d 172 (Fla. 1993); State v. Koss, supra.
The difficult situation presented to this Court in this case can be avoided in future cases if the Alabama Legislature seizes the opportunity to address this important issue, as the legislatures in other jurisdictions have done. We encourage the Legislature to address the existing body of law on self-defense as it relates to battered spouse syndrome.
 III.
Harrington next argues that the trial court erred when it excluded from evidence Moen's prior psychological evaluations. She contends that her theory of defense would have been bolstered by the prior evaluations and that the needs of her defense were superior to the patient/psychologist privilege that would otherwise have prevented disclosure of the reports. We disagree.
Prior to trial, Harrington filed a motion seeking the production of the psychological evaluation of Moen conducted in 1991 during proceedings related to a rape charge. The psychologist who conducted the evaluation, Dr. Renfro, submitted a letter to defense counsel in which he stated that his professional obligation to maintain the privileged communication between him and Moen prevented him from releasing the requested document. Harrington then sought a court order requiring Dr. Renfro to produce the records. The trial court held a hearing on the matter, and the parties submitted legal memoranda supporting their positions. Harrington acknowledged that Rule 503(b), Ala. R. *Page 300 
Evid., and § 34-26-2, Ala. Code 1975, established a legal privilege between patient and therapist that was commensurate with the attorney/client privilege, but argued that trial court had the inherent authority to declare the psychological report non-privileged because Moen waived the privilege when he agreed to submit to the examination as a condition of his probation. She argued further that the court should order production of the report because the evidence in the report was relevant and probative to her defense. Harrington submitted an affidavit from one of her experts, Dr. Manning, who stated that Moen's psychological report would be relevant and material to her evaluation in Harrington's case because it would clarify whether Moen demonstrated characteristics of an abusive personality. The State argued that the psychological evaluation had been conducted in another case and solely to determine whether Moen exhibited the characteristics of a repeat sexual offender and that Rule 503 expressly prohibited disclosure of the psychological report to other parties without a waiver by Moen. The trial court denied the motion to compel production of Moen's psychological evaluation.
A trial court's determination that privileged material will not be disclosed is given substantial deference, and the court's decision will be reversed only when it is an abuse of discretion. Schaefer v. State,695 So.2d 656, 661-63 (Ala.Crim.App. 1996).
Rule 503(b), Ala. R. Evid., provides that "[a] patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, made for the purposes of diagnosis or treatment of the patient's mental or emotional condition." Rule 503(c) indicates that the privilege continues even following the patient's death. The statutory provision governing the patient/therapist privilege provides that the confidential communications between a therapist and patient are "placed upon the same basis as those provided by law between attorney and client, and nothing in this chapter shall be construed to require any such privileged communication to be disclosed." §34-26-2, Ala. Code 1975. Thus, the report of the 1991 psychological evaluation of Moen is confidential, and it was not subject to disclosure absent extraordinary circumstances otherwise provided by law. Ex partePepper, 794 So.2d 340, 343 (Ala. 2001).
 "The Alabama psychotherapist-patient privilege, however, is subject to certain judicially created exceptions. This Court has recognized an exception to the privilege where, in a child custody matter, the mental state of one of the parents is at issue and a proper resolution of child custody requires disclosure of otherwise privileged psychiatric records. Harbin v. Harbin, 495 So.2d 72 (Ala. 1986). Further, the psychotherapist-patient privilege is unavailable in a criminal trial where the defendant raises the defense of insanity. Free v. State, 455 So.2d 137
(Ala.Crim.App. 1984); Magwood v. State, 426 So.2d 918
(Ala.Crim.App. [1982]), aff'd, 426 So.2d 929 (Ala. [1983]). . . .
 "The strength of the public policy on which the statutory psychotherapist-patient privilege is based has been well recognized by this Court. It follows that the privilege is not easily outweighed by competing interests.
 "`Statutes such as § 34-26-2 are intended to inspire confidence in the patient and encourage him in making a full disclosure to the physician as to his symptoms and condition, by preventing the physician from making public information that would result in *Page 301 
humiliation, embarrassment, or disgrace to the patient, and are thus designed to promote the efficacy of the physician's advice or treatment. The exclusion of the evidence rests in the public policy and is for the general interest of the community.'"
 "Ex parte Rudder, [507 So.2d 411,] at 413 [(Ala. 1987)]. In Rudder, where the defendant sought discovery of the plaintiff's psychiatric records in order to defend a claim of defamation, First Amendment free speech rights were not applicable because the psychotherapist-patient privilege made the information unavailable to the public. Id., at 416-17."
Ex parte United Serv. Stations, Inc., 628 So.2d 501, 504 (Ala. 1993) (emphasis added).
Harrington argues that Moen waived his right to confidentiality when he agreed to undergo the psychological evaluation as part of his plea agreement in 1991, and she relies on Crowson v. State, 552 So.2d 189
(Ala.Crim.App. 1989). In that case, Crowson, as a condition of his probation, agreed to attend counseling sessions as mandated by his probation officer. Crowson's probation was revoked based on a violation of that condition. Crowson objected to evidence from the therapist about his failure to attend scheduled appointments. This Court upheld the trial court's decision to admit the evidence, stating:
 "We hold that within the context of the granting or revocation of probation, where psychological counseling has been required as a condition of probation, the fact of whether or not the probationer is being treated or counseled by a psychologist as well as the fact of the probationer's attendance or nonattendance at any counseling session is not a `confidential relation or communication' within the purview of § 34-26-2."
552 So.2d at 190. We further noted that the psychologist/patient "`privilege does not cover statements which are intended to be communicated to third persons.'" Id. at 191, quoting C. Gamble, McElroy'sAlabama Evidence § 392.04 (3d ed. 1977).
The circumstances here are not at all analogous to those in Crowson. In 1991, Moen underwent a psychological evaluation to assist in determining how to dispose of a pending criminal charge and, presumably, the report was submitted to the court assigned to the case. It is wholly unreasonable to assume that Moen intended to waive his right to confidentiality so that the report could be released to anyone other than the court and the parties in that particular case. Application ofCrowson to the facts of this case would be unreasonable.
To the extent Harrington argues that the report of the 1991 psychological evaluation "was relevant and probative as to the state of mind of Jaime Harrington at the time of the shooting" (Harrington's brief at 26) and that the trial court's ruling on the motion to compel production of the report "prevented her right to call witnesses to testify to pertinent facts in her defense" (Harrington's brief at 27), the arguments fail to persuade. A psychological report generated as a result of charges involving Moen's prior romantic relationship — a relationship that ended years before he was killed — was not necessary to the development and presentation of Harrington's defense. Dr. Renfro and Dr. Manning testified extensively about the characteristics of abusers and victims of abuse. Harrington and Dr. Renfro gave detailed testimony about the abuse Harrington suffered during her relationship with Moen, and about its psychological effects on her. Harrington presented ample evidence from which the jury could have concluded that Harrington suffered from *Page 302 
battered spouse syndrome.[3] Harrington clearly was not precluded from calling any defense witnesses. Finally, and contrary to Harrington's assertion on appeal, the psychological report was not probative to her own mental state, because the report obviously addressed itself to certain of Moen's psychological characteristics.
None of Harrington's arguments persuade us that the trial court abused its discretion when it declined to order disclosure of Moen's 1991 psychological evaluation. Outside the confines of the 1991 proceeding, the communications and documents were privileged. Moen clearly did not waive the privilege, and Harrington failed to establish that the information was probative or relevant or that it was necessary to her defense. Harrington presented ample evidence indicating that she suffered from battered spouse syndrome and that Moen abused her. Under the facts of this case, the psychologist/patient privilege was due to be upheld. The trial court's ruling was correct, and Harrington is not entitled to any relief on this claim.
 IV.
Harrington next claims that the trial court abused its discretion when it admitted evidence about her extramarital relationships and her drug use. She asserts that she should not have been cross-examined about these matters and that the men with whom she had relationships — Arthur Pettaway, Oscar James, and Joseph Glover — should not have been permitted to testify because, she says, even if the evidence was relevant, it was extremely prejudicial. The State contends that Harrington has not preserved this issue for review. We agree with the State.
At trial, the prosecution introduced Harrington's videotaped statement, which included references to her drug use and extramarital affairs. Harrington did not object to the admission of the tape. One of Harrington's experts, Dr. Renfro, testified that Harrington admitted that she used drugs and that she had had an affair. Another defense witness, Tanya Defe, testified that she was aware of Harrington's drug use. Harrington's mother testified that she was aware that her daughter had had one or two affairs during the time she lived with Moen. Only after this testimony was presented and before Harrington testified did defense counsel make a motion in limine seeking to exclude evidence relating to Harrington's extramarital affairs and her drug use on grounds that it was prejudicial. The trial court denied the motion. During her own testimony on direct examination, Harrington was questioned about those matters, and she testified without objection on cross-examination about her drug use and her extramarital affairs. Thereafter, in its rebuttal case, the State elicited testimony from three men about their sexual relationship with Harrington and about her drug use. Harrington did not object to the witnesses testifying.
The claims now raised were not preserved for review. First, Harrington did not include Joseph Glover in her motion in limine and she did not object when he was called to testify, so she has preserved nothing for this Court's review as to Glover. Second, as the State argues, Harrington has failed to preserve for review any claims regarding the admission of testimony about her drug use and extramarital affairs because she failed to object to the witnesses' testimony after the trial *Page 303 
court denied her motion in limine. As discussed in Part I of this opinion, a ruling on a motion in limine does not generally preserve an issue for review; rather, the party must object when the evidence is offered and must receive an adverse ruling at trial in order to preserve an issue for review on appeal. E.g., Grimsley v. State, 678 So.2d 1197,1208 (Ala.Crim.App. 1996). Because Harrington did not object when the witnesses testified at trial and because she responded without objection to questions about her affairs and drug use, the issue was not preserved for review.
Furthermore, the State correctly notes that several witnesses, including defense witnesses, had testified about Harrington's extramarital relations and drug use before Harrington made a motion in limine to exclude such evidence. Much of the testimony that followed the motion in limine was merely cumulative to evidence previously admitted by Harrington or by the State without objection. Therefore, even if Harrington had preserved the issue for review, and she did not, and even if the trial court's ruling on the motion in limine was erroneous, any error would have been harmless.
Because Harrington failed to preserve this claim of error for appellate review, she is not entitled to any relief.
 V.
Harrington lastly argues that the trial court erred when it refused to give requested jury instructions 5 through 9 on the battered woman syndrome. She asserts that the instructions should have been given because they "were tailorized [sic] to [her] theory of defense" and because they "were necessary to dispel common erroneous perceptions lay people — who make up jurors [sic] — have about battered women." (Harrington's brief at 33, 36.) She further objects to the trial court's failure to give requested charge 1 relating to her diagnosis of post-traumatic stress disorder, and she argues that the requested instructions "necessarily advised the jury that Post Traumatic Stress Disorder could be the basis of Jaime's reasonable belief in a jury finding of justification of homicide." (Harrington's brief at 38-39.) Finally, Harrington objects to the court's failure to give requested charges 2 and 3 on intoxication as it related to Moen's drug intake and its relationship to her theory of self-defense. For the reasons discussed below, we find no error in the trial court's refusal to give the requested charges.
A trial court has broad discretion in formulating its charge to the jury, provided the instructions accurately state the applicable law.Davis v. State, 804 So.2d 1153, 1162 (Ala.Crim.App. 2000). In considering claims of error regarding a trial court's failure to give requested jury charges, we have stated:
 "Although it is well settled that `[a] defendant is entitled to have the trial court instruct the jury on his theory of defense,' Padgett v. State, 668 So.2d 78, 85 (Ala.Crim.App.), cert. denied, 668 So.2d 88 (Ala. 1995), it is equally well established that `[t]he trial judge may refuse to give a requested jury charge when the charge is either fairly and substantially covered by the trial judge's oral charge or is confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law.' Harris v. State, 794 So.2d 1214, 1220 (Ala.Crim.App. 2000)."
Reeves v. State, 807 So.2d 18, 41 (Ala.Crim.App. 2000).
The trial court in this case charged the jury on self-defense, and specifically instructed the jury that a person may use whatever degree of force is necessary, *Page 304 
including deadly force, to defend herself if she reasonably believes the other person is using or is about to use unlawful deadly force. (R. 782.) The court further defined those circumstances in which deadly physical force is authorized. (R. 782-83.) The trial court instructed the jury on the battered woman syndrome, and stated that the expert evidence about battered woman syndrome had been offered to assist the jury in determining whether Harrington reasonably believed when she shot Moen that she was in imminent danger. (R. 784.)
We find no error in the trial court's refusal to give the requested instructions 5, 8, and 9 on battered woman syndrome because the substance of the instructions was contained in the court's charge to the jury.
Instructions 6 and 7 were properly refused because they were argumentative and misleading. Instruction 6 provided:
 "Expert testimony on the `battered woman syndrome' helps dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any common sense conclusions by the jury that if the beatings, [physical and/or mental abuse, or threats] were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered woman syndrome would be put to rest, including the beliefs that women are masochistic and enjoy the beatings, [physical and/or mental abuse, or threats] and that they intentionally provoke their husbands into fits of rage. Bonner v. State, 740 So.2d 439, 440 (Ala.Crim.App. 1998)."
(C. 55; emphasis added.)
Instruction 7 provided:
 "Expert evidence on battered woman syndrome is admissible to show that because Jaime Harrington suffered from battered woman syndrome, it was reasonable for her to remain in the home and to have reasonably believed that her life was in imminent danger. . . It is admissible to show in regard to self defense that Jaime Harrington reasonably believed it was necessary to use deadly force to prevent imminent death or serious bodily injury to herself. Bonner v. State, 740 So.2d 439, 443 (Ala.Crim.App. 1998)."
(C. 55-56; emphasis added.)
The emphasized portions of the foregoing requested instructions demonstrate that, if the trial court had given these instructions to the jury, they would have removed from the jury some of its fact-finding duties by mandating certain findings. The requested instructions were therefore argumentative, and they were inconsistent with the court's instruction that the jury was the finder of fact. Furthermore, the instructions merely summarized some of the testimony given by defense witnesses. Therefore, no error occurred when the court refused to give those requested instructions.
Requested jury charge 1 on justification was substantially covered in the trial court's charge on self-defense. Therefore, the instruction was properly refused.
Requested charge 2 stated:
 "I charge you, members of the jury, that if you believe from the evidence that at the time of the killing the deceased was under the influence of alcohol [or drugs], and that as a result of being under such influence, the deceased was aggressive, or belligerent, or quarrelsome, then you should consider such facts in determining whether or not the defendant acted in self-defense in killing the deceased. . . ." *Page 305 
(C. 53-54.) Requested instruction 3 also referred to the deceased's being under the influence of alcohol at the time of the killing. (C. 54.)
The trial court properly refused to give these charges because they were unsupported by the evidence in the case. Although forensic tests revealed that Moen had a small amount of a controlled substance in his system when he died, the evidence was undisputed that Harrington shot him in the head while he was sleeping.
The trial court properly exercised its considerable discretion in formulating the jury charge in this case. No error occurred in the court's decision not to give the requested instructions, and Harrington is not entitled to any relief on this claim.
For the foregoing reasons, Harrington's conviction and sentence are affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.
[2] Jubilee City Fest is an annual weekend-long festival held in downtown Montgomery on Memorial Day weekend.
[3] The jury apparently did credit the defense testimony because it returned a verdict of guilty of manslaughter rather than murder.